## COMMONWEALTH *vs.* FRANKLIN PIERCE.

Worcester. Sept. 30. — Nov. 26, 1884. C. ALLEN & COLBURN, JJ., absent.

If a person publicly practising as a physician, on being called upon to attend a sick woman, prescribes, with foolhardy presumption or gross recklessness, a course of treatment which causes her death, he may be found guilty of manslaughter, although he acted with her consent, and with no evil intent.

An indictment for manslaughter, by causing the clothes of the person killed to be saturated with kerosene, need not allege that the accused knew of the deadly tendency of the kerosene, or that it was of a dangerous tendency.

At the trial of an indictment for manslaughter, there was evidence that the defendant, who practised as a physician, on being called to attend a sick woman, prescribed that her clothes should be kept saturated with kerosene, and that this course of treatment caused her death. The jury were instructed that the defendant was "to be tried by no other or higher standard of skill or learning than that which he necessarily assumed in treating her; that is, that he was able to do so without gross recklessness or foolhardy presumption in undertaking it." *Held*, that the instruction was sufficiently favorable to the defendant.

INDICTMENT, in five counts, for manslaughter.

The first count alleged that Franklin Pierce, at West Boylston, in the county of Worcester, " on the seventh day of January, in the year eighteen hundred and eighty-three, and on divers other days and times between that day and the ninth day of January, in said year eighteen hundred and eighty-three, in and upon one Mary A. Bemis of said West Boylston, in the county aforesaid, wilfully and feloniously, did make divers assaults, and that the said Franklin Pierce did then, and at the several times aforesaid, there wilfully, feloniously, ignorantly, rashly, injuriously, and improperly, put, pour, and place, and cause and procure to be put, poured, and placed, on and upon the body, arms, legs, and feet of her, the said Mary A. Bemis, certain large quantities, to wit, two gallons of kerosene oil, and that the said Franklin Pierce, by the means and in the manner aforesaid, did then, and at the several times aforesaid, there feloniously cause her, the said Mary A. Bemis, to be and become mortally sick, weak, shocked, diseased, and disordered in her body aforesaid, of which said mortal sickness, weakness, shock, disease, and disorder of her body, occasioned and brought on by the means and in the manner aforesaid, from the said seventh day of January, in the year aforesaid, until the fourteenth day of said January,

in the same year, at West Boylston aforesaid, in the county aforesaid, she, the said Mary A. Bemis, did languish and languishing did live, on which said fourteenth day of January, in the year aforesaid, at West Boylston aforesaid, in the county aforesaid, the said Mary A. Bemis, of the said mortal sickness, weakness, shock, disease, and disorder, occasioned and brought on as aforesaid, died. And so the jurors aforesaid, upon their oath aforesaid, do say that the said Franklin Pierce her the said Mary A. Bemis, in manner and form aforesaid, feloniously did kill and slay, against the peace of the said Commonwealth."

The second count was as follows : " And the jurors aforesaid, on their oath aforesaid, do further present, that said Franklin Pierce, at said West Boylston, in the county aforesaid, on the seventh day of January, in the year eighteen hundred and eighty-three, and on divers other days and times between that day and the ninth day of January, in the year aforesaid, in and upon one Mary A. Bemis, of said West Boylston, in the county aforesaid, wilfully and feloniously, did make divers assaults, and that the said Franklin Pierce did then, and at the several times aforesaid, there wilfully, feloniously, ignorantly, rashly, injuriously, and improperly put, pour, and place, and cause and procure to be put, poured, and placed, in, upon, and through certain underclothing, to wit, certain drawers, undershirt, and stockings, certain large quantities, to wit, two gallons, of kerosene oil, and did then, and at the several times aforesaid, there and thereby, wet and saturate, and cause and procure to be wet and saturated, said underclothing, to wit, said drawers, undershirt, and stockings, with the said large quantities of kerosene oil, and did then, and at the several times aforesaid, there wilfully, feloniously, ignorantly, rashly, injuriously, and improperly, put and place, and cause and procure to be put and placed, on and upon the body, arms, legs, and feet, of her, the said Mary A. Bemis, said underclothing, to wit, said drawers, undershirt, and stockings, so wet and saturated with kerosene oil as aforesaid, and that the said Franklin Pierce did then, and at the several times aforesaid, there wilfully, feloniously, ignorantly, rashly, injuriously, and improperly, cause and procure said underclothing, to wit, said drawers, undershirt, and stockings, so wet and saturated with kerosene oil as aforesaid, to remain on and upon the body, legs, arms, and feet

of her, the said Mary A. Bemis, for divers long spaces of time, and that the said Franklin Pierce, by the means and in the manner aforesaid, did then and at the several times aforesaid, there feloniously cause her, the said Mary A. Bemis, to be and become mortally sick, weak, shocked, diseased, and disordered in her body aforesaid, of which said mortal sickness, weakness, shock, disease, and disorder of her body, occasioned and brought on by the means and in the manner aforesaid, from the said seventh day of January, in the year aforesaid, until the fourteenth day of said January, in the same year, at West Boylston aforesaid, in the county aforesaid, she, the said Mary A. Bemis, did languish and languishing did live, on which said fourteenth day of January, in the year aforesaid, at West Boylston aforesaid, in the county aforesaid, the said Mary A. Bemis, of the said mortal sickness, weakness, shock, disease, and disorder, occasioned and brought on as aforesaid, died. And so the jurors aforesaid, on their oath aforesaid, do say that the said Franklin Pierce her, the said Mary A. Bemis, in manner and form aforesaid, feloniously did kill and slay, against the peace of said Commonwealth."

The remaining counts differed but slightly from the preceding, and need not be set forth.

In the Superior Court, before the jury were empanelled, the defendant moved to quash the indictment for the following reasons: " 1. The indictment, in the first count thereof, does not aver that the kerosene oil, which is therein alleged to have been put, poured, and placed on and upon the body, arms, legs, and feet of the said Mary A. Bemis, was deleterious, dangerous, or injurious in its nature, or that it was likely to produce the results in said counts alleged to have followed; and said count does not allege that the defendant knew or had reason to know that said kerosene oil was deleterious, dangerous, or injurious in its nature, or that he knew, or had reason to know, that it was likely to produce the results which are in said count alleged to have followed. 2. The indictment, in the second, third, fourth, and fifth counts thereof, does not allege that the kerosene oil, which is therein alleged to have been put, poured, and placed on said underclothing, was deleterious, dangerous, or injurious in its nature, or was likely to produce any dangerous or deleterious results, or that the defendant knew, or had reason to know, that it was

deleterious, dangerous, or injurious in its nature, or likely to produce deleterious, dangerous, or injurious results. And said counts do not contain any allegations that the putting and placing said underclothing, wet and saturated with kerosene oil, on and upon the body, arms, legs, and feet of the said Mary A. Bemis, was of deleterious, dangerous, or injurious tendency, or likely to produce the results therein alleged to have followed; nor do said counts contain any allegation that the defendant knew, or had reason to know, the putting and placing said underclothing, wet and saturated as aforesaid with kerosene oil, on and upon the body, arms, legs, and feet of the said Mary A. Bemis, was of deleterious, dangerous, or injurious tendency, or likely to produce the results aforesaid."

*Pitman*, J., overruled the motion. The defendant was then tried, and found guilty; and a bill of exceptions, in substance as follows, was allowed:

The evidence for the government tended to show that the defendant publicly practised as a physician; that he was called to attend Mary A. Bemis on December 29, 1882, and continued to attend her until January 7, 1883; that on that day, she being very sick and confined to her bed, he prescribed that kerosene oil should be applied to her as follows: that a flannel shirt, flannel drawers, and stockings should be saturated with it, and placed on her, and kept wet by renewing the wet flannels, &c. every three hours; that this was done, with her consent, by her husband and attendants, but not by the defendant personally; that after the defendant had gone, in about two hours, owing to the pain and distress of the patient, and upon her demand, the saturated flannels were removed, and the defendant was sent for.

The husband testified as follows: " On his arrival, I told the defendant how my wife had suffered and what we had done; she said it was as if she was in the fire; he replied that it was doing just what he wanted, like a poultice on a boil, drawing it out; that it was her only salvation. I told him that she would not bear it, and asked him if he would try to persuade her; he said he was too tender-hearted, that it was my wife instead of his; I then talked with her and told her that the doctor said it would not hurt so much the next time;— finally,

she said if he would stay and see the effect she would try it, and I so reported to him, and the flannels were saturated and replaced. The doctor remained until the patient fell asleep. She did not appear to suffer so much as before."

The defendant prescribed that the flannels should not be taken off, but kept wet with kerosene oil by pouring it upon them from a can, and this was done as before by her nurse and attendants, and not by the doctor personally. The flannels, saturated as aforesaid, were kept upon the patient until January 9, 1883, when they were removed by the defendant's direction.

The evidence tended to show that the effect of the kerosene was to blister and burn a large part of the surface of the body, removing the scarf skin from two thirds the surface, as estimated by the witnesses, and taking off the true skin over one third the surface of the body, and causing suppurating sores.

The defendant continued to attend her until January 14, when he was discharged, and other physicians were called, who testified that she was then past recovery. She died on January 16, 1883, and evidence was introduced tending to show that the cause of death was the burning and blistering produced by the application of kerosene oil as aforesaid.

The defendant introduced evidence tending to show that he had, prior to that time, made application of kerosene oil to patients for various complaints, with beneficial results, and with slight and temporary affection of the skin.

After the close of the defendant's evidence, the government was allowed, in the exercise of the discretion of the court, against the defendant's objection, to introduce a witness, who testified that the defendant had, prior to the time referred to in the indictment, applied to her kerosene oil, and that the effect was to blister and burn her flesh on her neck and breast to the bone, and that the doctor's attention was called to this at the time.

The defendant asked the judge to rule as follows: 1. This indictment does not sufficiently charge the crime of manslaughter, because it neither alleges that the kerosene oil alleged to have been placed on the deceased was of dangerous and noxious tendency, nor that the defendant knew, or had reason to know, that it was of dangerous or noxious tendency. 2. There is no evidence that the defendant made any assault on

the deceased, or assisted in or counselled any assault upon her, and therefore the allegations of the indictment are not proven. 3. There are no sufficient allegations in the indictment to raise the question what measure of knowledge and skill, or what measure of care, one who takes upon himself to prescribe for a sick person is bound to possess and bestow upon his patient, to avoid conviction of felony, if death results from his malpractice. 4. There are no allegations in the indictment to raise the question what degree of knowledge and skill, or what degree of care, one pretending to be learned in medicine is bound to possess, and bestow on his patient, to avoid conviction of felony, if death results from his malpractice. 5. The defendant cannot be convicted unless it is proven, beyond all reasonable doubt, that death resulted from the treatment he prescribed, and that he had so much knowledge or probable information of the fatal tendency of the prescription, that it may be reasonably presumed by the jury to be the effect of obstinate, wilful rashness, and not of an honest intent and expectation to cure. 6. If the defendant made the prescription with an honest purpose and intent to cure the deceased, he is not guilty of this offence, however gross his ignorance of the quality and tendency of the remedy prescribed, or of the nature of the disease, or of both. 7. There is no evidence in this case that the defendant, either from his own experience or from the information of others, had any knowledge of the fatal effects of kerosene oil when prescribed in the manner he prescribed it. 8. There being no allegations in this indictment that the defendant pretended to any peculiar knowledge or skill in the treatment of the sick, he cannot be convicted unless the prescription he made was one which any person of ordinary knowledge and information would have known to be of probably fatal tendency. 9. In considering whether the defendant was guilty of such gross negligence as to make him criminally liable, he is not, under this indictment, to be judged by the standard of knowledge to be applied to one claiming to be a physician possessing peculiar knowledge on the subject of medicine, but only by the standard applicable to unlearned men. 10. He cannot be convicted unless his conduct in making the prescription was such as would amount to gross negligence in any person of ordinary sense and capacity.

11. The defendant cannot be convicted under this indictment, if the death resulted from any degree of ignorance on his part, if he was acting with the purpose to cure or benefit the patient.

The judge declined to give any of the rulings requested; and instructed the jury on these points, in substance, as follows:

Injurious acts resulting from gross carelessness or foolhardy presumption, without intent to injure, may constitute an assault. If persons who are engaged in operating steam-engines are guilty of gross carelessness or foolhardy presumption, and injuries result, they are criminally liable. So, with apothecaries, if a person without knowledge and skill deals with deadly drugs, he may be guilty of gross carelessness amounting to presumption, and be criminally liable. Whenever men are called upon to act with dangerous agencies, the law holds them to some degree of criminal responsibility. If they are grossly careless, or reckless and presumptuous, they are guilty. The same general principle applies to medical treatment. The government must show, not merely the absence of ordinary care, but gross carelessness amounting to recklessness. A man is not to be convicted of manslaughter merely because of his ignorance. His ignorance is only important as bearing upon the question whether his conduct in the care and treatment of the patient was marked by foolhardy presumption or gross and reckless carelessness. The defendant in this case is to be tried by no other or higher standard of skill or learning than that which he necessarily assumed in treating her; that is, that he was able to do so, without gross recklessness or foolhardy presumption in undertaking it. It is not necessary to show an evil intent; if, by gross and reckless negligence, he caused the death, he is guilty of culpable homicide. The question is whether the kerosene (if it was the cause of the death), either in its original application, renewal, or continuance, was applied as the result of foolhardy presumption or gross negligence on the part of the defendant.

*F. P. Goulding,* for the defendant. 1. The motion to quash the indictment should have been sustained, or, at least, the first ruling asked for should have been granted. The indictment does not sufficiently charge the crime of manslaughter. Neither count alleges that the kerosene oil used by the defendant, in the manner and with the effect set forth, was of a dangerous or

deleterious tendency, or that the defendant knew it to be of such dangerous tendency. The court cannot know judicially that kerosene oil, applied in the manner the indictment alleges, would necessarily, or probably, injure the person to whom it was applied. Therefore the words of the indictment do not import that the defendant did any act which he knew, or had reason to know, would injure the deceased. The indictment should have alleged that the kerosene oil was a dangerous and noxious agent, and known by the defendant to be so. Heard's Crim. Law, 520. *Rex* v. *Long*, 4 C. & P. 398. *Rex* v. *Webb*, 1 Mood. & Rob. 405. *Rex* v. *Spiller*, 5 C. & P. 333.

2. The rulings requested were in accordance with those given in *Commonwealth* v. *Thompson*, 6 Mass. 134. This case has been followed in *Rice* v. *State*, 8 Mo. 561, and in *State* v. *Schulz*, 55 Iowa, 628. The English cases to the contrary are mere *nisi prius* judgments, and do not carry the weight of the leading case in this Commonwealth. These cases rest upon the case of *Rex* v. *Williamson*, 3 C. & P. 635, decided in 1807, by Lord Ellenborough; but the various expressions which have crept into the subsequent opinions, or charges to the jury, go further than the original authority. The language of Lord Ellenborough was: "There has not been a particle of evidence adduced which goes to convict the prisoner of the crime of murder; but still it is for you to consider whether the evidence goes so far as to make out a case of manslaughter. To substantiate that charge, the prisoner must have been guilty of criminal misconduct, arising either from the grossest ignorance or the most criminal inattention." The prisoner was acquitted. In the subsequent English cases these guarded phrases have given place to a variety of other phrases, which, at various times, have been held to constitute the definitions of that conduct which would render a man guilty of manslaughter; until, at length, it has been held that one practising as a physician may be convicted of manslaughter if death ensues from want of "competent skill," "proper skill," "proper care," or "proper knowledge," on his part.

In *Commonwealth* v. *Thompson*, Chief Justice Parsons instructed the jury, that, "to constitute manslaughter, the killing must have been a consequence of some unlawful act. Now, there is no law which prohibits any man from prescribing for

a sick person with his consent, if he honestly intends to cure him by his prescription." The case is not closely analogous to that of persons engaged, in public or quasi public places, in operating steam-engines or other dangerous machines. Such persons, by gross carelessness, expose others to danger, who in no way assent to their experiments with the dangerous instrumentality. The passenger in the car is as much a stranger to the engine driver, by whose carelessness he is injured, as is the passenger on the street to the persons by whose careless driving he is injured. But a patient has a right to employ whom he pleases to treat him, and acceptance of the employment by one who honestly believes he is able, and honestly intends to cure, is not a felonious act, however ignorant of medicine he may be in fact. The ruling in the case at bar is to the effect that, however free from fraudulent pretence the case may be, and however urgently a person may be solicited to undertake a cure, and however honestly he may act in the premises, if he undertakes to administer to a body or mind diseased, he may be convicted of manslaughter if a jury think he was grossly ignorant. Such a ruling leaves to the determination of an unlearned jury the question whether the practice of particular schools of medicine does not show gross ignorance, and would, in the language of Lord Ellenborough in the case cited, "tend to encompass a most important and anxious profession with such dangers as would deter reflecting men from entering into it."

3. The third and fourth rulings requested should have been given. The indictment contains no allegations to warrant the trial of the defendant for manslaughter, on the ground that he fraudulently pretended to medical skill, whereas in fact he was grossly ignorant, or that, possessing skill, he failed to use it, through gross negligence. If the English rule of liability is adopted, it must still be necessary to set forth the relation of the defendant to the deceased, and his pretences in the premises, in order that the offence may be fully and plainly, substantially and formally described. In such case, the liability arises out of the express or implied contract between the parties, whereby a relationship is created from which a duty springs, and that duty is violated by the failure to possess or apply the requisite skill and knowledge. *Rex* v. *Webb, ubi supra.*

4. The eighth, ninth, and tenth requests should have been given. The jury were authorized, by the rulings given, to find the defendant guilty, if they believed he did not possess the skill of a skilful physician. If the jury thought that, because the patient was very sick when the defendant was called, he ought to have possessed a very high degree of skill to treat her at all, they may upon this charge have convicted him for want of such skill.

*E. J. Sherman*, Attorney General, for the Commonwealth.

HOLMES, J. The defendant has been found guilty of manslaughter, on evidence that he publicly practised as a physician, and, being called to attend a sick woman, caused her, with her consent, to be kept in flannels saturated with kerosene for three days, more or less, by reason of which she died. There was evidence that he had made similar applications with favorable results in other cases, but that in one the effect had been to blister and burn the flesh as in the present case.

The main questions which have been argued before us are raised by the fifth and sixth rulings requested on behalf of the defendant, but refused by the court, and by the instructions given upon the same matter. The fifth request was, shortly, that the defendant must have "so much knowledge or probable information of the fatal tendency of the prescription that [the death] may be reasonably presumed by the jury to be the effect of obstinate, wilful rashness, and not of an honest intent and expectation to cure." The seventh request assumes the law to be as thus stated. The sixth request was as follows: "If the defendant made the prescription with an honest purpose and intent to cure the deceased, he is not guilty of this offence, however gross his ignorance of the quality and tendency of the remedy prescribed, or of the nature of the disease, or of both." The eleventh request was substantially similar, except that it was confined to this indictment.

The court instructed the jury, that "it is not necessary to show an evil intent;" that, "if by gross and reckless negligence he caused the death, he is guilty of culpable homicide;" that "the question is whether the kerosene (if it was the cause of the death), either in its original application, renewal, or continuance, was applied as the result of foolhardy presumption or

gross negligence on the part of the defendant;" and that the defendant was "to be tried by no other or higher standard of skill or learning than that which he necessarily assumed in treating her; that is, that he was able to do so without gross recklessness or foolhardy presumption in undertaking it." In other words, that the defendant's duty was not enhanced by any express or implied contract, but that he was bound at his peril to do no grossly reckless act when in the absence of any emergency or other exceptional circumstances he intermeddled with the person of another.

The defendant relies on the case of *Commonwealth* v. *Thompson*, 6 Mass. 134, from which his fifth request is quoted in terms. His argument is based on another quotation from the same opinion : "To constitute manslaughter, the killing must have been a consequence of some unlawful act. Now, there is no law which prohibits any man from prescribing for a sick person with his consent, if he honestly intends to cure him by his prescription." This language is ambiguous, and we must begin by disposing of a doubt to which it might give rise. If it means that the killing must be the consequence of an act which is unlawful for independent reasons apart from its likelihood to kill, it is wrong. Such may once have been the law, but for a long time it has been just as fully, and latterly, we may add, much more willingly, recognized that a man may commit murder or manslaughter by doing otherwise lawful acts recklessly, as that he may by doing acts unlawful for independent reasons, from which death accidentally ensues. 3 Inst. 57. 1 Hale P. C. 472–477. 1 Hawk. P. C. *c.* 29, §§ 3, 4, 12; *c.* 31, §§ 4–6. Foster, 262, 263 (Homicide, *c.* 1, § 4). 4 Bl. Com. 192, 197. 1 East P. C. 260, *& seq.* *Hull's case,* Kelyng, 40, and cases cited below.

But recklessness in a moral sense means a certain state of consciousness with reference to the consequences of one's acts. No matter whether defined as indifference to what those consequences may be, or as a failure to consider their nature or probability as fully as the party might and ought to have done, it is understood to depend on the actual condition of the individual's mind with regard to consequences, as distinguished from mere knowledge of present or past facts or circumstances from which some one or everybody else might be led to anticipate or

apprehend them if the supposed act were done. We have to determine whether recklessness in this sense was necessary to make the defendant guilty of felonious homicide, or whether his acts are to be judged by the external standard of what would be morally reckless, under the circumstances known to him, in a man of reasonable prudence.

More specifically, the questions raised by the foregoing requests and rulings are whether an actual good intent and the expectation of good results are an absolute justification of acts, however foolhardy they may be if judged by the external standard supposed, and whether the defendant's ignorance of the tendencies of kerosene administered as it was will excuse the administration of it.

So far as civil liability is concerned, at least, it is very clear that what we have called the external standard would be applied, and that, if a man's conduct is such as would be reckless in a man of ordinary prudence, it is reckless in him. Unless he can bring himself within some broadly defined exception to general rules, the law deliberately leaves his idiosyncrasies out of account, and peremptorily assumes that he has as much capacity to judge and to foresee consequences as a man of ordinary prudence would have in the same situation. In the language of Tindal, C. J., "Instead, therefore, of saying that the liability for negligence should be coextensive with the judgment of each individual, which would be as variable as the length of the foot of each individual, we ought rather to adhere to the rule which requires in all cases a regard to caution such as a man of ordinary prudence would observe." *Vaughan* v. *Menlove*, 3 Bing. N. C. 468, 475; *S. C.* 4 Scott, 244.

If this is the rule adopted in regard to the redistribution of losses, which sound policy allows to rest where they fall in the absence of a clear reason to the contrary, there would seem to be at least equal reason for adopting it in the criminal law, which has for its immediate object and task to establish a general standard, or at least general negative limits, of conduct for the community, in the interest of the safety of all.

There is no denying, however, that *Commonwealth* v. *Thompson*, although possibly distinguishable from the present case upon the evidence, tends very strongly to limit criminal liability

more narrowly than the instructions given. But it is to be observed, that the court did not intend to lay down any new law. They cited and meant to follow the statement of Lord Hale, 1 P. C. 429, to the effect "that if a physician, whether licensed or not, gives a person a potion, without any intent of doing him any bodily hurt, but with intent to cure, or prevent a disease, and, contrary to the expectation of the physician, it kills him, he is not guilty of murder or manslaughter." 6 Mass. 141. If this portion of the charge to the jury is reported accurately, which seems uncertain, (6 Mass. 134, n.,) we think that the court fell into the mistake of taking Lord Hale too literally. Lord Hale himself admitted that other persons might make themselves liable by reckless conduct. 1 P. C. 472. We doubt if he meant to deny that a physician might do so, as well as any one else. He has not been so understood in later times. *Rex* v. *Long,* 4 C. & P. 423, 436. *Webb's case,* 2 Lewin, 196, 211. His text is simply an abridgment of 4 Inst. 251. Lord Coke there cites the Mirror, *c.* 4, § 16, with seeming approval, in favor of the liability. The case cited by Hale does not deny it. Fitz. Abr. *Corone,* pl. 163. Another case of the same reign seems to recognize it. Y. B. 43 Ed. III. 33, pl. 38, where Thorp said that he had seen one M. indicted for killing a man whom he had undertaken to cure, by want of care. And a multitude of modern cases have settled the law accordingly in England. *Rex* v. *Williamson,* 3 C. & P. 635. *Tessymond's case,* 1 Lewin, 169. *Ferguson's case,* 1 Lewin, 181. *Rex* v. *Simpson,* Willcock, Med. Prof., Part 2, ccxxvii. *Rex* v. *Long,* 4 C. & P. 398. *Rex* v. *Long,* 4 C. & P. 423. *Rex* v. *Spiller,* 5 C. & P. 333. *Rex* v. *Senior,* 1 Moody, 346. *Webb's case, ubi supra; S. C.* 1 Mood. & Rob. 405. *Queen* v. *Spilling,* 2 Mood. & Rob. 107. *Regina* v. *Whitehead,* 3 C. & K. 202. *Regina* v. *Crick,* 1 F. & F. 519. *Regina* v. *Crook,* 1 F. & F. 521. *Regina* v. *Markuss,* 4 F. & F. 356. *Regina* v. *Chamberlain,* 10 Cox C. C. 486. *Regina* v. *Macleod,* 12 Cox C. C. 534. See also *Ann* v. *State,* 11 Humph. 159; *State* v. *Hardister,* 38 Ark. 605; and the Massachusetts cases cited below.

If a physician is not less liable for reckless conduct than other people, it is clear, in the light of admitted principle and the later Massachusetts cases, that the recklessness of the criminal no

less than that of the civil law must be tested by what we have called an external standard. In dealing with a man who has no special training, the question whether his act would be reckless in a man of ordinary prudence is evidently equivalent to an inquiry into the degree of danger which common experience shows to attend the act under the circumstances known to the actor. The only difference is, that the latter inquiry is still more obviously external to the estimate formed by the actor personally than the former. But it is familiar law that an act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it. If the danger is very great, as in the case of an assault with a weapon found by the jury to be deadly, or an assault with hands and feet upon a woman known to be exhausted by illness, it is murder. *Commonwealth* v. *Drew*, 4 Mass. 391, 396. *Commonwealth* v. *Fox*, 7 Gray, 585. The doctrine is clearly stated in 1 East P. C. 262.

The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw. To say that he was presumed to have intended them, is merely to adopt another fiction, and to disguise the truth. The truth was, that his failure or inability to predict them was immaterial, if, under the circumstances known to him, the court or jury, as the case might be, thought them obvious.

As implied malice signifies the highest degree of danger, and makes the act murder; so, if the danger is less, but still not so remote that it can be disregarded, the act will be called reckless, and will be manslaughter, as in the case of an ordinary assault with feet and hands, or a weapon not deadly, upon a well person. Cases of *Drew* and *Fox*, *ubi supra*. Or firing a pistol into the highway, when it does not amount to murder. *Rex* v. *Burton*, 1 Stra. 481. Or slinging a cask over the highway in a customary, but insufficient mode. *Rigmaidon's case*, 1 Lewin, 180. See *Hull's case*, *ubi supra*. Or careless driving. *Rex* v. *Timmins*, 7 C. & P. 499. *Regina* v. *Dalloway*, 2 Cox C. C. 273. *Regina* v. *Swindall*, 2 C. & K. 230.

If the principle which has thus been established both for murder and manslaughter is adhered to, the defendant's intention

to produce the opposite result from that which came to pass leaves him in the same position with regard to the present charge that he would have been in if he had had no intention at all in the matter. We think that the principle must be adhered to, where, as here, the assumption to act as a physician was uncalled for by any sudden emergency, and no exceptional circumstances are shown; and that we cannot recognize a privilege to do acts manifestly endangering human life, on the ground of good intentions alone.

We have implied, however, in what we have said, and it is undoubtedly true, as a general proposition, that a man's liability for his acts is determined by their tendency under the circumstances known to him, and not by their tendency under all the circumstances actually affecting the result, whether known or unknown. And it may be asked why the dangerous character of kerosene, or " the fatal tendency of the prescription," as it was put in the fifth request, is not one of the circumstances the defendant's knowledge or ignorance of which might have a most important bearing on his guilt or innocence.

But knowledge of the dangerous character of a thing is only the equivalent of foresight of the way in which it will act. We admit that, if the thing is generally supposed to be universally harmless, and only a specialist would foresee that in a given case it would do damage, a person who did not foresee it, and who had no warning, would not be held liable for the harm. If men were held answerable for everything they did which was dangerous in fact, they would be held for all their acts from which harm in fact ensued. The use of the thing must be dangerous according to common experience, at least to the extent that there is a manifest and appreciable chance of harm from what is done, in view either of the actor's knowledge or of his conscious ignorance. And therefore, again, if the danger is due to the specific tendencies of the individual thing, and is not characteristic of the class to which it belongs, which seems to have been the view of the common law with regard to bulls, for instance, a person to be made liable must have notice of some past experience, or, as is commonly said, " of the quality of his beast." 1 Hale P. C. 430. But if the dangers are characteristic of the class according to common experience, then he who

uses an article of the class upon another cannot escape on the ground that he had less than the common experience. Common experience is necessary to the man of ordinary prudence, and a man who assumes to act as the defendant did must have it at his peril. When the jury are asked whether a stick of a certain size was a deadly weapon, they are not asked further whether the defendant knew that it was so. It is enough that he used and saw it such as it was. *Commonwealth* v. *Drew, ubi supra.* See also *Commonwealth* v. *Webster*, 5 Cush. 295, 306. So as to an assault and battery by the use of excessive force. *Commonwealth* v. *Randall*, 4 Gray, 36. So here. The defendant knew that he was using kerosene. The jury have found that it was applied as the result of foolhardy presumption or gross negligence, and that is enough. *Commonwealth* v. *Stratton*, 114 Mass. 303, 305. Indeed, if the defendant had known the fatal tendency of the prescription, he would have been perilously near the line of murder. *Regina* v. *Packard*, C. & M. 236. It will not be necessary to invoke the authority of those exceptional decisions in which it has been held, with regard to knowledge of the circumstances, as distinguished from foresight of the consequences of an act, that, when certain of the circumstances were known, the party was bound at his peril to inquire as to the others, although not of a nature to be necessarily inferred from what were known. *Commonwealth* v. *Hallett*, 103 Mass. 452. *Regina* v. *Prince*, L. R. 2 C. C. 154. *Commonwealth* v. *Farren*, 9 Allen, 489.

The remaining questions may be disposed of more shortly. When the defendant applied kerosene to the person of the deceased in a way which the jury have found to have been reckless, or, in other words, seriously and unreasonably endangering life according to common experience, he did an act which his patient could not justify by her consent, and which therefore was an assault notwithstanding that consent. *Commonwealth* v. *Collberg*, 119 Mass. 350. See *Commonwealth* v. *Mink*, 123 Mass. 422, 425. It is unnecessary to rely on the principle of *Commonwealth* v. *Stratton, ubi supra,* that fraud may destroy the effect of consent, although evidently the consent in this case was based on the express or implied representations of the defendant concerning his experience.

As we have intimated above, an allegation that the defendant knew of the deadly tendency of the kerosene was not only unnecessary, but improper. *Regina* v. *Packard, ubi supra.* An allegation that the kerosene was of a dangerous tendency is superfluous, although similar allegations are often inserted in indictments, it being enough to allege the assault, and that death did in fact result from it. It would be superfluous in the case of an assault with a staff, or where the death resulted from assault combined with exposure. See *Commonwealth* v. *Macloon,* 101 Mass. 1. See further the second count, for causing death by exposure, in *Stockdale's case,* 2 Lewin, 220; *Regina* v. *Smith,* 11 Cox C. C. 210. The instructions to the jury on the standard of skill by which the defendant was to be tried, stated above, were as favorable to him as he could ask.

The objection to evidence of the defendant's previous unfavorable experience of the use of kerosene is not pressed. The admission of it in rebuttal was a matter of discretion. *Commonwealth* v. *Blair,* 126 Mass. 40.          *Exceptions overruled.*