TAMPA ELECTRIC COMPANY, A CORPORATION, *Plaintiff in Error*, v. KATHERYN MERLE BAZEMORE, AN INFANT, BY HER FATHER AND NEXT FRIEND, HOYT R BAZEMORE, *Defendant in Error*.

Opinion Filed February 13, 1923.

Petition for Rehearing Denied March 9, 1923.

1. Assignments of error which are not argued in the appellate court will be considered as abandoned.

2. Negligence constituting a cause of civil action is the failure to observe, for the protection of another's interest, such care and vigilance as the circumstances justly demand and the want of which causes such other's injury.

3. The doctrine of imputed negligence does not obtain in this State.

4. In an action for damages for personal injuries inflicted by a street railroad company by the running of its cars the fact

of injury being established the statute raises the presumption that the injury was the result of the company's negligence and the burden is cast upon the company of overcoming that presumption by showing that its agents exercised all ordinary and reasonable care and diligence in running the car, such diligence and care being made to appear the statutory presumption ceases.

5. Where a motorman, an employee of a street railroad company, in charge of a street car approaches a street crossing and observes an infant child approaching the railroad track and there is ample distance between the moving car and the child at the time it is observed by the motorman to be approaching the track within which to bring the car to a standstill and avoid collision with the child, but such precaution is not taken by the motorman and a collision with the child results, in which it sustains serious injury, the statutory presumption of negligence on the part of the company is confirmed.

6. An instruction that the only question for the jury to decide is whether the defendant was guilty of any negligence whatsoever is harmless in a case where damages are sought for personal injuries against a railroad company when there is no dispute as to the fact of injury and the record discloses no character of negligence other than that which is alleged in the declaration.

7. In an action to recover damages against a street railroad company for injury to an infant child it is not error to instruct the jury to disregard any consideration of the question whether it was or was not careless or improper for the child's father or mother to permit it to be on the street under the circumstances existing at the time and place of the injury.

8. An erroneous instruction upon the question of negligence in a case for personal injuries inflicted by the running of a street car, which charge prescribes an unreasonable measure of ordinary care to be observed by the company's employee in charge of the car, is harmless error in view of the testimony of the motorman, defendant's witness, that he saw the person

injured before the accident in danger and far enough away in which the motorman could have avoided the accident by stopping the car.

9. In an action for damages for personal injuries when the damages awarded by the jury do not appear to be unreasonable and outrageous and to suggest that the jury was influenced by passion, partiality, prejudice or corruption, nor that the verdict is flagrantly outrageous and extravagant it will not be disturbed as excessive.

10. A requested instruction announcing a correct principle of law applicable to the case should be given. Its refusal however will not be considered as reversible error when an instruction in different phraseology announcing the same principle in substance is given.

11. Instructions requested which are not applicable to the evidence are properly refused.

12. It is not proper to interrogate a juror upon his *voir dire* concerning his judgment upon the merits of the controversy conditioned upon the existence or non-existence of one or more immaterial or uncontrolling facts and an erroneous instruction from the court upon them.

A Writ of Error to the Circuit Court for Hillsborough County; F. M. Robles, Judge.

Judgment affirmed.

*Knight, Thompson & Turner, for* Plaintiff in Error;

*McKay & Withers,* for Defendant in Error.

ELLIS, J.—On the 24th day of April, 1920, the defendant in error, Kathryn M. Bazemore, a little girl about two and a half years old, was run over by a street car owned

and operated by the plaintiff in error in the City of Tampa at or near the intersection of Franklin and Estelle streets.

The accident occurred about 7:30 o'clock P. M., it was not then dark but the electric light at the corner was burning. When the street car was stopped it was discovered that the child was pinned under the car by a brake beam immediately behind the right front wheel. The right side of the car had to be raised from the track before the child could be removed. The right front wheel of the car had passed over her left arm, almost completely severing it near the shoulder joint. The arm was subsequently amputated by surgeons. Although the child was lying under the car between the tracks, her body pinned to the ground by a brake beam and her left arm almost severed at, or near, the shoulder when she was removed, there were no other bruises upon her body of such character as required medical or surgical attention.

In June 1920 the child by its next friend, her father, brought an action against the Tampa Electric Company for damages for personal injuries.

The declaration contains two counts. The first count alleges as a basis for recovery that the defendant failed to use "reasonable care" in the operation of its car so as to avoid injuring the plaintiff, but on the contrary so "negligently, carelessly and improperly *drove and operated*" it that it was caused to collide with the plaintiff and run over her producing the injuries named. The second count alleges as a basis for recovery that the defendant failed to "use all reasonable and proper care to provide, construct, maintain and keep in proper working condition on said street cars such usual and customary safety appliances and devices as were commonly used in connection with street cars of like type" and "did not use all reasonable care to

provide proper brakes on said street car and to keep the same in proper working condition, and to provide a proper fender or fenders on said street car and to keep the same in proper wroking condition.'' And that as a proximate consequence of such negligence the plaintiff was injured.

The word "fender" as used in this declaration had reference to a contrivance sometimes called "life guard" which is placed, not in front of the car, but under it and some distance behind its fore end and in front of the forward wheels.

The defendant pleaded first, the general issue; second, that as the car approached the place where the accident occurred the child suddenly and unexpectedly came upon the track immediately in front of the car and so close to it that the car could not, with the greatest amount of care, have been prevented from running upon and over the child; third, that the presence of the child in the street and upon the defendant's track in front of the approaching car was due to the negligence of the plaintiff's father in not providing a competent person to attend upon the child and guard it against dangers incident to the streets; fourth, that the father of the child did not exercise resasonable care to restrain the child from going upon the tracks of the defendant and into the place of danger.

Demurrers to the second, third and fourth pleas were sustained and a motion to strike them was granted and the parties went to trial upon the general issue.

There was a verdict and judgment for fifteen thousand five hundred dollars in favor of the plaintiff and the defendant took a writ of error.

The assignments of error made upon the order sustaining the demurrer to the pleas and the motion to strike them

are not argued and are therefore considered to be abandoned.  See Porter v. Parslow, 39 Fla. 50, 21 South Rep. 574; The Southern Express Company v. Van Meter, 17 Fla. 783; Lake v. Hancock, 29 Fla. 336, 11 South. Rep. 97; Caldwell v. People's Bank of Sanford, 73 Fla. 1165, 75 South. Rep. 848.

The last assignment of error is the first discussed by counsel for the plaintiff in error, it rests upon the denial of the motion for a new trial and the ground of the motion is that the verdict was not sustained by the evidence. The theory upon which the plaintiff sought to recover damages from the defendant for the injury sustained consisted of two propositions: one, expressed in the first count of the declaration, charged the defendant with negligent and careless *driving and operation* of the car; the other expressed in the second count, charged the defendant with negligence in not providing brakes and a fender or "life guard" on the car in suitable working order and condition to prevent the accident when the danger to the child became apparent.

Whether the latter charge constitutes negligence depends upon the circumstances attending the injury, for it is easily conceivable that an adult or a child of tender years, such as the plaintiff, may come within the danger zone of an approaching street car so suddenly and unexpectedly that the brakes upon a car running at a reasonable and safe rate of speed, although applied at once, could not overcome the car's momentum in time to prevent injury to the person in danger, notwithstanding the brakes were in perfect working condition and measured up to the standard of perfect safety. It is also conceivable that the "trip" or triggers to a car's fender or "life guard" attachment, in perfect working condition, might not hang close enough to

the ground to strike against the body of a very small child lying upon the track and release the fender, which falling promptly, would have protected the infant from the wheels of the car.

All civil liability has been said to depend upon the tendency of a person's acts under circumstances known to him, and faut is to be found only in action or nonaction accompanied by knowledge, actual or implied, of the probable results of the defendant's conduct. See 20 R. C. L. 11; Commonwealth v. Pierce, 138 Mass. 165.

If the defendant was not chargeable with negligence in running its car upon the child, that is to say, in the first contact between the child and the car; in striking against the child and knocking it down, if that in fact happened, it is not clear that the defendant would be chargeable with negligence because the "trip" or triggers failed to spring the fender and lower it to the rails, thereby preventing the body or limbs of the child from being injured by the wheels, which may have been caused by the "trip" or triggers being at too great an elevation to strike so small an object as a very small child of two and a half years of age, lying flat upon the ground, however this point is not determined as the view which we have of the evidence renders it unnecessary to decide it.

It is diiffcult, if not impossible, to give an exact definition of negligence in its technical legal sense, because says Shearman & Redfield, such a definition must obviously exclude all acts and omissions which do not violate any legal obligation, as well as many which do. See 1 Shearman & Redfield on Negligence, p. 9.

The definition offered by those authors is as follows: "Negligence, constituting a cause of civil action, is such

an omission, by a responsible person, to use that degree of care, diligence and skill which it was his legal duty to use for the protection of another person from injury as, in a natural and continuous sequence, causes unintended damage to the latter.''

In the case of Jacksonville Street Railway Company v. Chappell, 21 Fla. 175, Mr. Justice Raney, speaking for the court defined negligence to be the ''failure to observe, for the protection of another's interest, such care, protection and vigilance as the circumstances justly demand, and the want of which causes him injury.'' See also Bucki v. Cone, 25 Fla. 1, (text 28), 6 South. Rep. 160; Florida R. Co. v. Sturkey, 56 Fla. 196, 48 South. Rep. 34.

The doctrine of imputed negligence does not obtain in this state, the negligence of parents who permit their infant children to go insufficiently attended, or alone, upon the streets of a large city may be considered as imposing no obligation upon street railway companies to equip their cars with such mechanical devices as will effectively prevent injuries to children in such extraordinary situations.

The fact of injury having been inflicted upon the child, by the running of defendant's car, the presumption is raised by our statute that the injury was the result of defendants's negligence. See Section 4964 Revised General Statutes, 1920; Farnsworth v. Tampa Electric Co., 62 Fla. 166, 57 South. Rep. 233; Atlantic Coast Line R. Co. v. Crosby, 53 Fla. 400, 43 South. Rep. 318.

The burden therefore was cast upon the defendant of overcoming the presumption by showing that its agents exercised all ordinary and reasonable care and diligence in the running of the car. If the defendant made it to appear that it used such ordinary and reasonable care, the

statutory presumption ceased and the plaintiff should. not have recovered.

According to the case made by the declaration, the negligence of the defendant consisted first, in the manner in which the car was *driven,* which according to the liberal . construction which the court has placed upon declarations of the type of the first count, may refer to unreasonable speed or inattention to duties by the motorman; second, in the use of defective brakes and defective fenders, or life guards.  Considering the case as made in the first count and the allegation as to defective brakes as the second count the question for this court to determine upon. this assignment of error is: does the evidence show that the defendant, by and through its agent the motorman upon the street car, used all ordinary and reasonable care and diligence in the running of the car .and that the brakes upon the car were in reasonably safe condition, that is to say, in condition to overcome within a reasonable distance the momentum of the car traveling at a reasonable rate of speed?

From the examination which we have made of the evidence it appears that the question is narrowed to one of speed at which the car was driven and whether under the circumstances that rate of speed was a breach of duty which the company owed to the plaintiff.

The evidence tended to show that the brakes upon the car were in good condition and effective to bring the car, traveling at a reasonable rate of speed, to stop within a reasonable distance, that the motorman did see the perilous situation of the child in time to prevent the accident by bringing the car to a full stop before it struck the child, and that the motorman was not a reckless wanton, unmindful of the rights of the people upon the streets and

indifferent to the sufferings of those who might be run down by his recklessness, but upon the other hand that he was a prudent, cautious, trustworthy and competent employee.

If the street car was driven at a rate of speed dangerous to persons at the crossing, that is to say, at such a rate of speed that the car could not be controlled by appliances in good condition effective to control the car traveling at a reasonable rate of speed so to protect one from injury who was discovered or should have been discovered to be in a dangerous situation in time to avoid injury to him, then the verdict should not be disturbed.

Many definitions of reasonableness in the matter of speed as applied to street cars have been attempted but it is difficult to formulate a general rule which would apply to all situations alike. In so far as liability to pedestrians for injuries to them inflicted by street cars is concerned, the matter of reasonable speed is one controlled by so many elements of time, place and conditions both as they relate to the road's equipment and pedestrian travel that an inflexible rule of liability cannot be formulated. An injury occurring at one time and place, under certain conditions to one of a certain class of persons, might be justly attributable to the defendant's negligence, whereas an injury inflicted upon one of another class under identical conditions or upon one of the same class at a different time or at a different place would not be. It is by no means accurate to say that a certain rate of speed at which a street car may be driven is at all times and under all conditions *per se* negligence on the part of the person in charge of the car. The question of negligence in such matter depends upon time, place and all circumstances surrounding the incident in which the injury occurs. 2 Nellis on Street Railways, Sec. 346.

For this reason in the case at bar it is impossible to say from the rate of speed alone at which the car was driven at the Estelle Street crossing, that the defendant was negligent. There was no liability if there was no breach of duty. Whether there was a breach by the defendant of a duty which it owed to the plaintiff, is a question upon which the very able and lengthy, if not exhaustive, briefs of counsel both for plaintiff and defendant in error do not enlighten us. A lengthy discussion of the evidence would be of little or no aid in the solution of the question, because it is impossible to determine from it at just what moment or at just what place the injury occurred, with reference to where the child was first seen by the motorman near the sidewalk.

The car was going northward on Franklin street. As it approached the Estelle street crossing at which the motorman did not intend to stop, he sounded the car's gong, gave the usual warnings under such circumstances and saw the child near the southeast corner of Estelle and Franklin street standing on the curbing. His car was then about five car lengths south of Estelle street traveling about fifteen miles per hour, then he saw the child start across the street diagonally, she was then about eighteen feet ahead of the car. The motorman at once applied his brakes and reversed the car, that is, cut off the power and stopped the car within the distance between that point and about eight or ten feet north of the north line of Estelle street. The little girl attempted to cross the track about six feet ahead of the car. It was heavily loaded with passengers, slightly behind schedule time and the motorman made no effort in endeavoring to stop the car to use the sand in the sand box.

These are the salient facts in the motorman's testimony. When the motorman first saw the child on or near the

curbing at the south side of Estelle street she was with another child, a "little girl" to whom Mr. Bazemore, the father of the plaintiff, had entrusted her. The car was then about five car lengths or about one hundred and thirty-five feet from the south line of Estelle street. Covering the distance of about one hundred and twenty feet and coming to within ten or fifteen feet south of the south line of Estelle street the motorman reduced the speed of his car to ten miles per hour, it was at this moment that he saw the child start diagonally across the street, it was then that he had notice of the child's apparent purpose. At least he was then aware of the child's danger or should have been aware of it. But it appears from the testimony of the child's father that it was removed from under the car at the distance of about forty-eight feet from the south line of Estelle street. Assuming that the car stopped, as the motorman said, within six feet after striking the child, she must have been struck about forty-two feet north of Estelle street's south line, or twenty-two feet north of Estelle street.

These are the measurements of distances given by Mr. Bazemore, assuming that the jury believed them to be accurate, it follows that when the motorman first became aware of the child's purpose to cross the street, that is to say, when he first became aware of its imminent peril, the front of his car was about fifty-six or two car lengths approximately from the point where it struck the child.

It is difficult to conceive that a street car in good operating condition with no defective appliances, running at the rate of ten miles per hour on an up grade, which is not brought to a standstill in less distance than twice its own length, is operated with that degree of efficiency necessary to a proper discharge of the duty which rested upon

the defendant in this case when the danger of the child first became apparent to the motorman. Certainly such facts are not sufficent to rebut the presumption of negligence cast upon the defendant by the statute.

The motorman, according to his testimony, had noticed the child on the curbing when the car was five or six car lengths away. When it was ten or fifteen feet south of the south line of Estelle street he slowed the speed of the car down to ten miles per hour, it was at that moment that he saw the child start diagonally across the street. That being true, the motorman had thirty-five or more feet in which to bring the car to a full stop and thereby avoid the accident.

According to his own statement, the motorman saw the child running up Franklin street from the south curbing of Estelle street, he saw her when she left the curbing and started diagonally across, he was then about eighteen feet from her and struck her at about the ''north curbing of Estelle street.'' Therefore according to his statement he did not stop his car under thirty-five or thirty-eight feet after he became aware of the child's imminent peril. But the evidence is undisputed that a car of the type used, in good condition traveling at the rate of ten miles per hour can be stopped within five feet at the place where the injury occurred, but if it had been stopped in eighteen feet from the point south of Estelle street where it was when the motorman saw the child start to cross, it would have stopped opposite the point from which she started, and several feet behind her.

The car covered the distance of thirty-eight feet in the same time it took the child to run twenty feet. If the jury accepted the motorman's statement the conclusion

was inevitable that he took a chance with the life of the child, or did not have the car under control.

It is contended by counsel for plaintiff in error that a certain instruction was erroneous because it announced the proposition that the only question for the jury to decide aside from the amount of damages to be awarded in the event of a verdict for the plaintiff, was "whether or not the defendant in the operation of the street car at the time and place in the declaration mentioned was guilty of any negligence whatsoever which proximately resulted in injury to the plaintiff," and that if the jury answered that question in the affirmative the verdict should be for the plaintiff. The objection is to the phrase "any negligence whatsoever." It is contended that the phrase is too broad and might embrace negligence which was not alleged in the declaration as a basis of recovery. But as there is no evidence in the record of any character of negligence other than that covered by the allegations of the declaration the criticism loses its force.

The court instructed the jury that in arriving at their verdict they should disregard any consideration of the question whether it was or was not careless or improper for the "plaintiff's father or mother to permit her to be on the street under the circumstances existing at the time and place of her injury." That no negligence of either father or mother of plaintiff would in law affect any right she may have to recover for negligent injury to her by the defendant.

There was no error in this instruction. It simply stated a proposition of law which was not disputed and there was much evidence to which it applied. The very fact that the child was about two years old, had living parents and was practically alone in the street, attended by a

child, a little older but not very attentive, necessarily would direct a layman's attention to the inquiry concerning the parent's responsibility in such case and how, if at all, the child's right to recover would be affected by its parent's neglect.

The objection to the fifteenth instruction, which informed the jury that a motorman operating a car on a track forming a part of the street must maintain constant watchfulness for those who in using or crossing the street are in dangerous proximity to the track and must operate his car under such control that if a person is on or dangerously near the track ''the car may be stopped before causing the injury,'' contains merit. That charge considered alone, without reference to other charges and the evidence of the case is seriously defective. It prescribes a rule as the measure of ordinary care beyond the power of reasonably prudent and cautious people endowed with the usual and sensuous and perceptive powers to comply with during the operation of a street car. In view of the the evidence in the case however, particularly that of the motorman who testified that he saw the child and was therefore aware of its danger, when the car was far enough away to have stopped it and avoided the accident, we consider the error to have been harmless. In this connection we refer to Chapter 6223, Acts 1911, Florida Statutes, as applicable.

The verdict rendered was for the sum of fifteen thousand dollars. We are not prepared to say it was excessive. It does not at first blush appear to be unreasonable and outrageous, and to suggest that the jury was influenced by passion, partiality, prejudice or corruption, nor that it is flagrantly outrageous and extravagant. See Coleman v. Southwick, 9 John. (N. Y.) 45, 6 Am. Dec. 253.

Although the life expectancy of the infant was not shown by the evidence to be a certain number of years, we know that while people die both young and old that one must. be an infant before one comes to physical maturity, that normal children usually live and "grow up." There is no evidence. to show that the child was not normal in health, upon the other hand the contrary appeared to be the case. The amount of the verdict does not appear to be excessive as compensation for the injury during the period of the child's infancy. The measure of damages in a case like the one at bar embraces many elements. The pain and suffering both physical and mental resulting from the character or nature of the injury, the inconvenience, humiliation and embarrassment she will suffer on account of the loss of an arm, the diminished capacity for enjoyment of life to which all the limbs and organs of the body with which nature has provided us are so essential, and her diminished capacity for earning a livelihood. All of these inconveniences and humiliations the child will suffer the remainder of her life regardless of the element of her life expectancy.

The element of uncertainty in this case relates to the amount and not the fact of damage. The extent of the injury and the amount of damage are incapable of exact and accurate proof. The child lost an arm, but that is not the extent of the injury. No one .can possibly describe the attendant injuries of such a misfortune, every day of her life, whether it be one or eighty years longer, she will suffer annoyances and inconveniences which would be difficult to describe if known but none the less inconveniences, vexations and disadvantages. These injuries necessarily follow from the loss of the child's limb. The matter of fixing the amount of compensation must be left to the jury's discretion within the limits fixed

by the pleadings. We cannot say that the jury has abused its discretion. Citations of authority would be to no purpose. We have found no authority in which the general rule here announced is denied. See 13 Cyc. 127.

The seventh ground of the motion for a new trial discussed under the twenty-seventh assignment of error is that the court refused to instruct the jury upon the defendant's request as follows: "Public utility corporations should be required to respond in damages for negligent injuries, but, as also contemplated by law, they should not be required to compensate for injuries which, in law, they are not responsible."

The charge contains elementary doctrine and was fully covered by the court in the ninth instruction requested by the defendant and given. In that instruction the jury were informed that when the presumption of negligence raised by the statute was removed the burden was upon the plaintiff to prove the case by a fair preponderance of the evidence, which is equivalent to the same thing as that the defendant, a public utilities corporation, is not required to compensate an injured person for "injuries for which in law" the defendant was not responsible.

We have examined the remaining grounds of the motion for a new trial discussed under the last assignment of error and find no reversible error. The instructions requested and refused were not applicable to the evidence.

The question propounded to the juror Ellis was not a proper question because it eliminates the idea that the defendant would be responsible for the injury if the car had not been properly equipped with brakes or was run at an excessive or dangerous speed. The juror was asked if the motorman seeing the child's danger did all he could to

stop the car would the juror find for the defendant if the court instructed the jury that if the motorman did all he could to stop the car the defendant would be absolved from responsibility.

In the first place the court would not have given such instruction and in the second place the defendant would not have been relieved from liability if the car was running at a dangerous or reckless speed, or if it had not been properly equipped with suitable brakes and appliances to stop it within a reasonable distance going at a reasonable and safe speed, even if the motorman did all he could to stop it when he saw the child's danger.

We have discovered no reversible error in the record so the judgment is affirmed.

TAYLOR, C. J., AND WHITFIELD AND WEST, J. J., concur.

BROWNE, J., concurs specially.

BROWNE, J.—Specially concurring.

If the motorman saw the child when it placed itself in danger by running towards the street car, and he then had time to stop the car before it struck the child, the railway is liable.

It appears from the testimony that he did not intend to stop his car at Estelle street, but that he rang the bell violently for the crossing, before reaching it.

The child, with several other persons, was standing at or near the corner, and prior to starting to run towards the car, there was nothing to warn the conductor that the child or any of the other persons standing there would run into the car and be struck by it.

Street cars cannot be operated if conductors must anticipate that any child on the sidewalk or a few feet from the curb will run into the car. If so, cars would have to crawl along a busy thoroughfare (such as the testimony showed Franklin street to be) on the presumtion that any moment without warning, a child may rush across the street and collide with a car. Human experience is to the contrary, and therefore merely seeing a child on or near a sidewalk, is not notice to the motorman that the child is in a dangerous position with regard to the car he is operating.

Mrs. Mabel Green, a witness for the plaintiff below, whose testimony was not impeached, and which bears the impress of truthfulness, gives a picture of the child standing about eight feet from the track, and suddenly dashing towards the car and running into it before it was possible for the motorman to stop, and without anything—before the child started to run,—to warn the motorman that she would do so.

It is inconceivable that the number of persons who were near the child at the time she started to run, if she traversed any distance, could and would not have rescued it. The bystanders, however, like the motorman, could not anticipate the rash impulse of the little child.

The child was there to take a car for Sulphur Springs. She was keen for the trip, and full of childish exuberance. She evinced it by jumping up and down with elation as she saw a car approaching. She supposed it would stop and ran out to board it, and was struck by it and injured. Her action was so quick that the bystanders were not able to prevent it, nor the motorman to stop his car in time to avoid the injury. The pertient part of Mrs. Green's testimony is as follows:

"A.   At the moment the child was struck by the car I was right on the corner opposite where she was struck.
*   *  .  *

Q.   Now before this street car hit Kathryn did you see Kathryn with reference to where she was, and what she was doing?

A.   Yes sir.

Q.   Where was she?

A.   I saw Katherine standing, what you would call a crossing where the street car is supposed to stop, by the track, jumping up in a child like manner like any little tot would do to board a car, not standing still.

Q.   At the time you saw her was she off the sidewalk or on the sidewalk?

A.   She was off the sidewalk, you would call it out of the road, I suppose, near the track.

Q.   About how far was she from the side of the curb when you saw that?

A.   I should judge about four feet.

Q.   You say she was just jumping up and down in that way?

A.   In a manner, looked like she was just jumping in an innocent manner, as though just going to board the first car that came along.

Q.   And she was off the curb in the street at that time?

A.   Yes sir she was off the curb as I told you.

Q.   She was just jumping up and down or was she just starting across the street car track?

A.   At the minute I seen her she was jumping by the track, and the next thing I recollect she was struck. That is all I know.

Q.   Mrs. Green, I understand you to state that you were standing on the opposite corner of Estelle and Franklin

street and that you saw this little girl out about four feet from the curbing in the middle of the street?

A.   That is not the middle of the street.   It is a triangle from the corner near the track.

Q.   Was she alone out there?

A.   No sir; she was not alone out there.

Q.   Who was with her?

A.   I couldn't tell you who was with her.   There was several people standing around there.

Q.   Several people standing around her?

A.   Yes sir; at the corner.   Several that were waiting to board cars.   It was a street car crossing.   I couldn't testify who was with her, and I didn't notice anyone particularly.   I was a stranger at the time.

Q.   You observed the little girl out about four feet in the street?

A.   Yes sir.

Q.   Did she at that time have anyone with her?

A.   I couldn't swear to it because I did not see any body with her, if they were with her I did not know it.

Q.   Could you tell the jury whether she was out there alone or was there anybody with her or not?

A.   I noticed the little tot standing where I testified and four or five people on the corner and people coming and going, but I couldn't swear that there was anybody standing by her side.

Q.   Was she out there in the street by her self?

A.   No she was not out there alone because there were people all around there.

Q.   And she was out there on the street jumping and the next minute she was struck by the car?

A.   Yes sir, I said that.   I said she was standing jumping in a child-like manner near the track and the next thing I knew the child was under the car.

Q.   Did you observe her from the time that you saw her jumping in the street until she was hit by the car?

A.   Well, it was just a matter of a minute's time.

Q.   Did you observe her during the intervening time?

A.   Yes sir; I was looking straight in that direction.

Q.   How did she get on the track?

A.   I couldn't tell you how she got on the track.

Q.   You did not observe her, did you?

A.   I saw the child standing right by the track and the next thing I knew she was under the wheels.   That is all I could tell you.

Q.   Was it done quickly.

A.   Yes sir.

Q.   Instantly?

A.   I would say.

Q.   From the time you saw her out in the street about four feet from the curb it was then instantly almost when she was under the car?

A.   Yes sir.   *   *   *

Q.   This bell that you heard ringing, was that bell ringing before you saw her in the street there jumping and clapping her hands?

A.   I heard the bell ring violently and the car kept coming.   The little child, of course, she was standing there, and the next thing I noticed, the child there by the track in this little child-like manner, and the next thing she was under the wheels.   And that is all I can tell you.
*   *   *

Q.   After the car rang violently did you look at the car or the little girl?

A.·  Well, I could see it all in this way:   That the bell kept ringing and the car kept coming.   It is not much distance, and I was standing here and the car came on high speed and the little child was standing there when

the bell rang, and the next thing she was struck. I couldn't say how she was struck. I knew she was under the wheels, and know the child was standing there and I heard the bell ringing and the next thing the little child was struck.

Q. Did you see her run in front of the car?

A. No sir; I did not. I just saw her the instant before she was struck and then under the car.

\*   \*   \*

Q. Do you know at what time the child got on the track after the bell was rung?

A. Well, I didn't see Kathryn right on the track. I saw her right by the track. The bell rang and it was just a matter of a few seconds until the child was under the wheels.

\*   \*   \*

Q. Did you say she was in danger when you saw her standing out there in the street?

A. I didn't have time to think about it.

Q. I understood you to state that she was, to your best estimate, about four feet from the curbing in the street when you saw her?

A. I stated that.

Q. And there were some other people around her, but who they were you don't know?

A. I didn't know the people.

Q. And that is the last you saw of the child until she was under the car?

A. Yes sir. It was a matter of an instant's time. I saw her by the track and then I saw her under the car, and saw her dragged and taken out.

\*   \*   \*

Q. I want you to tell the jury whether there was any grown person standing out there in the street by the side

of her apparently taking care of her or was she out there in the street by herself?

A.  I will swear that she was not alone. There was about five people standing near.

\*   \*   \*

Q.  Do you mean to tell this jury that this little tot was out on the street that was thickly traveled on that night alone and by herself and you did not go to where she was?

A.  Well, the child was standing there.  I wasn't making a special study of the child.  If you will let me explain it in my own way I can tell you:  I was standing there at the corner.  In fact I was sick myself.  I wasn't able to rescue that child from the car.  After I left the porch and the bell rung, I noticed that bell rung.  I didn't know Kathryn was going to get hit, and she was standing jumping up and down in that child-like manner on that very spot where I told you, and if there was anybody with her, I didn't take particular notice, and I can swear that there was grown up people and two or three young folks, and a couple of negro people, colored people,—excuse the expression,—and two or three white people, and I was on the opposite corner and didn't try to rescue her, and didn't know she was going to get struck and was hardly able myself.  I would give my life to save anybody."

In this answer this witness repeats:  "I didn't know Kathryn was going to get hit," "didn't know she was going to get struck."  From her description of the accident, it is quite apparent that the "grown up people and two or three young folks and a couple of negro people" who were there, did not think the child was going to suddenly run towards the car and be hit by it, and that the action of the child was too quick to be prevented by any of these bystanders.

Notwithstanding the apparent truthfulness of Mrs. Green's testimony and its accord with all the other facts and circumstances in the case, and with our knowledge of the sudden and unreasonable impulses of an immature child, the jury evidently saw fit to reject it, and if they did so, and found, by taking part of one witness' testimony and part of another's, and rejecting parts of each, that the negligence of the motorman was established, under the rule adopted by this court, the verdict will not be disturbed. And so notwithstanding what my personal views are with regard to the manner in which the accident occurred, since the majority of the court are for affirmance, I am constrained to concur in the decision.