# CASES ARGUED AND DETERMINED

IN THE

# SUPREME COURT

OF THE

## STATE OF IDAHO.

(January 23, 1900.)

### STATE v. RASMUSSEN.

[59 Pac. 933.]

CONSTITUTIONAL LAW—DISEASED SHEEP—QUARANTINE.—An act of the Idaho legislature, establishing quarantine against diseased sheep, etc., passed on March 13, 1899, held not to be in contravention of section 8, article 1, nor section 2, article 4, of the constitution of the United States.

(Syllabus by the court.)

APPEAL from District Court, Oneida County.

Brown & Henderson, S. C. Winters, and John J. Guheen, for Appellant.

The important question involved in this cause is the constitutionality of this legislation. It appears to have been settled and determined by this court in the case of *State v. Duckworth*, 5 Idaho, 642, 51 Pac. 456; *Territory v. Evans*, 2 Idaho, 658, 23 Pac. 115; *Railway Co. v. Husen*, 95 U. S. 465; *Kimmish v. Ball*, 129 U. S. 217, 9 Sup. Ct. Rep. 277; *Missouri etc. Ry. Co. v. Haber*, 169 U. S. 613, 18 Sup. Ct. Rep. 488; *Henderson v. Mayor*, 92 U. S. 259. Wherever it is apparent that the legislation was not in good faith to provide for the health or regulation of their own property or persons, but to hamper or prevent the introduction of other property from other states to create difficulties with regard to them, the court

declares the law unconstitutional as an attempt to interfere with commerce. (*In re Rebman,* 41 Fed. 868; *Brimmer v. Rebman,* 138 U. S. 78, 11 Sup. Ct. Rep. 213; *Voight v. Wright,* 141 U. S. 62, 11 Sup. Ct. Rep. 855; *Minnesota v. Barber,* 136 U. S. 313, 10 Sup. Ct. Rep. 862; *Leisy v. Hardin,* 135 U. S. 100, 10 Sup. Ct. Rep. 681; 1 United States Supp. Rev. Stats., p. 779; *Vance v. W. A. Vandercock Co.,* 170 U. S. 444, 445, 18 Sup. Ct. Rep. 674.) It is for the legislature and not for the executive or judiciary to say what shall be quarantined, and on what terms and in what way these sheep shall be admitted or handled when they are admitted. The detail must be established by the legislature and not by the executive. This is a power that the legislature cannot delegate to the governor. (Sutherland on Statutory Construction, par. 68, p. 69, par. 69, p. 71; *Slinger v. Henneman,* 38 Wis. 504-508, 510; *State v. Field,* 17 Mo. 529, 59 Am. Dec. 275; Cooley's Constitutional Limitations, 1st ed., 116, 117, and note; Cooley's Constitutional Limitations 6th ed.)

Samuel H. Hays, Attorney General, for the State.

Quarantine laws are a familiar exercise of the police power by the state. Their enactment is within its lawful province and the making of regulations for their enforcement has always been intrusted to subordinate boards. (*Train v. Boston Disinfecting Co.,* 144 Mass. 523, 59 Am. Rep. 113, 11 N. E. 929; *Metcalfe v. City of St. Louis,* 11 Mo. 103; *Polinsky v. People,* 73 N. Y. 65.) The act follows alone the line of the laws of the United States on these subjects. (U. S. Supp. Rev. Stats., 2d ed., p. 794; Act of Congress, Feb. 15, 1893.) Similar provisions are found in the statutes of other states. (Mont. Pol. Code, secs. 3008, 3035; Wyo. Laws 1899, secs. 2081, 2082; Ariz. Rev. Stats., sec. 2812.) No legislative authority is delegated under the act. (*Field v. Clark,* 143 U. S. 649, 12 Sup. Ct. Rep. 495; *Hurst v. Warner,* 102 Mich. 238, 47 Am. St. Rep. 525, 60 N. W. 440; *Sang Lung v. Jackson,* 85 Fed. 502; *Los Angeles Co. v. Spencer,* 126 Cal. 670, 77 Am. St. Rep. 217; 59 Pac. 202; *Marlin v. Witherspoon,* 135 Mass. 175; *United States v. Ormsbee,* 74 Fed. 207.) The act provided that when

the governor had reason to believe that scab had become epidemic he must issue his proclamation. The law did not specify on what he must base his belief nor in what words he should issue his proclamation. Findings of fact and conclusions of law are not necessary preliminaries to a proclamation; it would be valid without any recital of reasons whatever. (*Wolsey v. Chapman,* 101 U. S. 755.) The act in question is a reasonable quarantine regulation. (*Railroad Co. v. Husen,* 95 U. S. 465; *Patterson v. Kentucky,* 97 U. S. 501; *Louisville etc. R. R. Co. v. Kentucky,* 161 U. S. 699, 16 Sup. Ct. Rep. 714.) It is customary in statutes of this kind to provide for a quarantine against infected localities. (U. S. Supp. Rev. Stats., 2d ed., p. 794; Mont. Pol. Code, secs. 3008, 3035; Wyo. Laws 1899, secs. 2081, 2082; Act of Congress, Feb. 15, 1893; Cal. Pol. Code, sec. 3017.) A Michigan statute containing such a provision has been upheld. (*Hurst v. Warner,* 102 Mich. 238, 47 Am. St. Rep. 525, 60 N. W. 440; *Minneapolis etc. Ry. v. Milner,* 57 Fed. 276; *St. Louis etc. Ry. v. Smith,* 20 Tex. Civ. App. 451, 49 S. W. 627; *Compagnie Francaise de Nav. v. State Board,* 51 La. An. 645, 72 Am. St. Rep. 458, 25 South. 591; *Lynch v. Grayson,* 5 N. M. 487, 25 Pac. 992. Affirmed in 163 U. S. 468, 16 Sup. Ct. Rep. 1064; *Croff v. Cresse,* 7 Okla. 408, 54 Pac. 558; *Train v. Boston Disinfecting Co.,* 144 Mass. 523, 59 Am. Rep. 113, 11 N. E. 929.) Whether a regulation of this kind is reasonable must depend largely on the nature of the disease to be prevented. As to the disease and its character we refer to Bulletin 21, United States Department of Agriculture, and the Rules and Regulations of the Bureau of Animal Industry. (Rules and Regulations Bureau Animal Industry, p. 26; *Kimmish v. Ball,* 129 U. S. 217, 9 Sup. Ct. Rep. 277; *Missouri etc. Ry. Co. v. Haber,* 169 U. S. 613, 18 Sup. Ct. Rep. 488.)

HUSTON, C. J.—The appellant was convicted of a violation of the provisions of an act of the legislature of Idaho, and the proclamation of the governor issued under and in obedience to the command of said statutes, from which judgment this appeal is taken. The said act is as follows:

"Section 1. Whenever the governor of the state of Idaho has reason to believe that scab or any other infectious disease of

sheep has become epidemic in certain localities in any other state or territory, or that conditions exist that render sheep likely to convey disease, he must thereupon, by proclamation, designate such localities and prohibit the importation from them of any sheep into the state, except under such restrictions as, after consultation with the state sheep inspector, he may deem proper. Any person or corporation who, after publication of such proclamation, receives in charge any such sheep from any of the prohibited districts, and transports, conveys or drives the same to and within the limits of any of the counties of this state, is punishable by a fine not exceeding $1,000 nor less than $200, and is liable for all damages that may be sustained by any person by reason of the importation or transportation of such prohibited sheep.

"Sec. 2. Upon issuing such proclamation, the owners or persons in charge of any sheep being shipped into Idaho, against which quarantine has been declared, must forthwith notify the deputy inspector of the county into which such sheep first come, of such arrival, and such owner or persons in charge must not allow any sheep so quarantined to pass over or upon any public highway, or upon the ranges occupied by other sheep, or within five miles of any corral in which sheep are usually corraled until such sheep have first been inspected, and any person failing to comply with the provisions of this section is punishable as provided in section one of this act and is liable for all damages sustained by any person by reason of the failure to comply with the provisions of this section."

On the twelfth day of April, 1899, the governor of Idaho, in compliance with the provisions of said act, issued the following proclamation:

"State of Idaho, Executive Office.

"Whereas, I have received statements from reliable wool-growers and stock raisers of the state of Idaho, said statements being supplemented by affidavits of reputable persons, all to the effect that the disease known as 'scab' or 'scabbies' is epidemic among sheep in certain localities or districts, viz., in the county of Cache, state of Utah, the county of Box Elder, state of Utah, and the county of Elko, in the state of Nevada; and

whereas, it is known that sheep from said districts are annually moved, driven, or imported into the state of Idaho, and, if so moved, would thereby spread infection and disease on the ranges and among the sheep of this state, which act would result in great disaster: Now, therefore, I, Frank Steuenberg, governor of the state of Idaho, by virtue of authority in me vested, and after due consultation with the state sheep inspector, do hereby prohibit the importation, driving, or moving into the state of Idaho of all sheep now being held, herded, or ranged within said infected district, viz., the county of Cache, in the state of Utah, the county of Box Elder, in the state of Utah, and the county of Elko, in the state of Nevada, or which may hereafter be held, herded, or ranged within said infected districts, for a period of sixty days from and after the date of this proclamation. After the termination of said sixty days, sheep can be moved into this state only upon compliance with all laws of the state of Idaho regarding the inspection and dipping of sheep. In witness whereof, I have hereunto set my hand, and caused to be affixed the great seal of the state. Done at Boise, the capital, this 12th day of April, in the year of our Lord one thousand eight hundred and ninety-nine.

"FRANK STEUENBERG. [Seal]

"By the governor:

"M. PATRIE,<br>"Secretary of State."

While there are some sixteen assignments of error in this case, it is conceded by counsel for appellant that the important question involved is the constitutionality of the act of the legislature of Idaho under which the conviction was had. It is claimed that this case comes within the reasoning of this court in the case of *State v. Duckworth,* 5 Idaho, 642, 51 Pac. 456, 39 L. R. A. 365. In that case the defendant was convicted of a violation of an act of the legislature of Idaho passed in 1895, and amended in 1897, section 6 of which act provides as follows:

"Sec. 6. Any person, persons, company, corporation or association intending to bring, or cause to be brought from any other state or territory into any of the counties of the state of Idaho, any sheep, he or they must first notify the deputy sheep

inspector of the district or county nearest to the point of entrance into this state that at a fixed date he will be within twenty miles from the state line at a designated point, with said sheep for inspection; and it shall be the duty of the deputy sheep inspector to examine such sheep within three days, and if pronounced sound, to immediately dip such sheep once, and then upon being tendered his compensation as hereinafter provided, issue a permit allowing such sheep to enter this state subject to such regulations as are enforced on resident sheep. But if such sheep are found scabby or infected with any contagious or infectious disease, then the deputy sheep inspector must dip said sheep twice with an interval of from eight to fifteen days between dipping and then issue a permit for said sheep to enter said state under the same regulations as heretofore provided; provided, however, that all sheep must enter said state within three days from final dipping, otherwise permit so issued shall be null and void. And any person or persons violating any of the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction, they shall be punished by a fine of not less than one hundred ($100) dollars, nor more than three hundred ($300) dollars, or by imprisonment in the county jail not less than two months nor more than six months, or by both such fine and imprisonment; provided, that any person, persons, company, corporation or association bringing or causing to be brought any sheep into any counties of this state in violation of the provisions of this act, shall be fined in addition to the penalty imposed in this section, five cents per head, for every sheep so brought into this state, which shall be a lien on said sheep; and it shall be the duty of the deputy sheep inspector to seize and hold such sheep by such means as he deems best, for a period of ten days, and if said sum is not paid within that period, to advertise and sell said sheep, or as many of the same as may be necessary to satisfy and pay such fine and costs."

And section 14 of the law of 1895 provides as follows:

"Sec. 14. It shall be unlawful for any person, persons, company, corporation or asociation, owning, controlling or managing any ferry-boat, toll-bridge, car, steamboat or other things

used for transportation, to allow any sheep to be carried thereon, unless the party in charge of said sheep shall first produce a certificate from a deputy sheep inspector appointed under this act, that said sheep are free from scab, scabbies or other infectious or contagious disease. Any violation of this section shall be deemed a misdemeanor and punishable by a fine of not less than one hundred dollars nor more than two hundred and fifty dollars."

A comparison of the act of 1897 with the act under question will, we think, disclose a greater difference than existed between the law of Missouri held by the supreme court of the United States to be invalid in *Railroad Co. v. Husen,* 95 U. S. 465, 24 L. ed. 527, and the law of Kansas, the validity of which was sustained by the same court in *Missouri etc. Ry. Co. v. Haber,* 169 U. S. 613, 18 Sup. Ct. Rep. 488, 42 L. ed. 878. The statute under consideration in the case of *State v. Duckworth, supra,* prohibited the introduction into this state, in any manner or form, or the transportation through the state, in any way or by any means, of any sheep, until same had been inspected by a sheep inspector of Idaho, which inspection must be made twenty miles beyond the state line of Idaho; and all sheep must be dipped at least once, and, if found infected, twice, before they were allowed to enter the state, and all this to be done by a sheep inspector of Idaho, twenty miles beyond the line of the state. The law of 1899 was intended as a quarantine law. It does not exclude all sheep, but only such as from the fact of their coming from an infected district, are liable to import disease. The statute of 1899, under which appellant was convicted, is simply a quarantine law—nothing more, nothing less. We do not understand that it is, or ever was, an essential to the enforcement of a quarantine that the fact of the existence of the disease in the subject of the quarantine should be primarily established. As we understand, it is a preventive measure. It will hardly be claimed, we apprehend, that the state has not the power to prevent, by legislative enactment, the introduction within its boundaries of diseased animals; and this is all that the act under consideration purports or is intended to accomplish.

The chief of the bureau of animal industry, in his report to the secretary of agriculture dated March 15, 1898, says: "In the United States, some sections have been overrun with sheep scab, and many persons engaged in the sheep industry have been forced to forsake it because of their losses from this disease. It is probable that, in its destruction of invested capital, sheep scab is second only to hog cholera, among our animal diseases. The large flocks of the plains and Rocky Mountain region, and the feeding stations further east, have suffered severely, and are constantly sending diseased animals to the great stock yards of this country." The same officer states in his letter transmitting his report to the secretary of agriculture: "The disease known as 'scab' is one of the most serious drawbacks to the sheep industry, and results in enormous financial losses; yet, despite its insidious nature, its ease of transmission, its severe effects, and its prevalence in certain localities, it is a disease which yields readily to proper treatment." That the length of time of quarantine fixed by the Idaho statute is not excessive is, we think, shown by the rules laid down by the authority already cited: "1. Scabby sheep should never be driven upon a public road; 2. Sheds in which scabby sheep have been kept should be thoroughly cleaned, disinfected, and aired, and should be left unused for at least four weeks (better, two months) before clean sheep are placed in them; 3. Fields in which scabby sheep have been kept should stand vacant at least four weeks (better, six or eight) before being used for clean sheep; 4. A drenching rain will frequently serve to disinfect a pasture, but it is well to whitewash the posts against which scabby sheep have rubbed. Even after observing the precautions here given, it is not possible to absolutely guaranty that there will be no reinfection, but the probabilities are against it." (Report of Chief of Bureau of Animal Industry, 1898.) With this authoritative statement before them, the legislature of Idaho enacted the law under consideration. That, under the conditions established and recognized, some legislation was necessary for the effective prevention of the spread of this disease among the sheep of this state, must be conceded; and we are clearly of the opinion that that adopted by the legislature was the most effec-

tive, and the least objectionable, that could have been adopted. Counsel for appellant speaks somewhat contemptuously of these reports of the bureau of animal industry to the secretary of agriculture of the United States, but we notice that they are cited as authority by the supreme court of the United States in *Kimmish v. Ball,* 129 U. S. 217, 9 Sup. Ct. 277, 32 L. ed. 695. The supreme court, in the last-mentioned case, in drawing the distinction between it and the case of *Railroad Co. v. Husen,* 95 U. S. 465, 24 L. ed. 527, says: "The decision in that case [*Railroad Co. v. Husen*] rested upon the ground that no discrimination was made by the law of Missouri, in the transportation forbidden, between sound cattle and diseased, and this circumstance is prominently put forth in the opinion." The same distinction appears between the Idaho law of 1895 and 1897 and the law of 1899. The law of 1895 and 1897 prohibited the bringing into the state of any sheep until the same had been inspected and treated by an Idaho sheep inspector twenty miles beyond the state line. The law of 1899, and the proclamation of the governor thereunder, quarantine sheep coming from an infected district or locality, before permitting them to be driven into this state. Our legislature, in rightful recognition of the large and constantly increasing importance of the sheep industry, as one of the most important elements of the wealth and resources of the state, have enacted most stringent and comprehensive laws for the protection of those animals from disease. But what avails the enactment or the enforcement of laws for the protection of sheep within the state, if we are to be constantly subject to an invasion of sheep from the infected districts of adjoining states or counties? And we do not think that a law made simply and solely for the protection of the sheep of this state from infection by the introduction into the state of sheep from a known infected district can in any way be said to interfere with commerce between the states, or abridge the rights of citizens of other states within this state. The law only requires persons who desire to drive sheep into this state from known infected districts to be subject to the same rules and regulations for the prevention and cure of disease among their sheep so sought to be driven into this state as is required of our own citizens. The supreme

court of the United States, in *Missouri etc. Ry. Co. v. Haber,*
169 U. S. 613, 18 Sup. Ct. Rep. 488, 42 L. ed. 878—which is,
we believe, the latest expression of that court upon this ques-
tion—says: "Neither corporations nor individuals are entitled,
by force alone of the constitution of the United States, and
without liability for injuries resulting thereform to others, to
bring into one state, from another state, cattle liable to import
or capable of communicating disease to domestic cattle. The
contrary cannot be affirmed under any sound interpretation of
the constitution. This court, while sustaining the power of
the Congress to regulate commerce among the states, has stead-
ily adhered to the principle that the states possess, because they
have never surrendered, the power to protect the public health,
the public morals, and the public safety, by any legislation ap-
propriate to that end which does not encroach upon rights
guaranteed by the national constitution, nor come in conflict
with the acts of Congress passed in pursuance of that instru-
ment. Although the powers of a state must, in their exercise,
give way to a power exerted by Congress under the constitution,
it has never been adjudged that that instrument by its own
force gives anyone the right to introduce into a state, against
its will, cattle so affected with disease that their presence in the
state will be dangerous to domestic cattle." We can see but
little difference in principle between the case of *Railway Co. v.
Haber* and the case under consideration. The Kansas statute
under consideration in that case made any person or persons
bringing into that state any cattle liable or capable of communi-
cating Texas, splenic, or Spanish fever to any domestic cattle
of that state, liable for all damages that might be sustained by
reason of the communication of said disease: "Proof that the
cattle which such person or persons are charged with shipping,
driving or keeping, or which are claimed to have communicated
the said disease, were brought into this state from south of the
thirty-seventh parallel of north latitude, shall be taken as
*prima facie* evidence that such cattle were between the first day
of February and the first day of December of the year in which
the offense was committed capable of communicating and liable
to import Texas, splenic or Spanish fever within the meaning

of this act, and that the owner or owners, person or persons in charge of such cattle had full knowledge and notice thereof." And this statute was upheld by the United States supreme court against a contention predicated upon the same lines contended for by the appellant in this case, to wit, the limit of the power of the state in the matter of public regulations.

The contention of appellant that it was not shown that any of the sheep driven by him into this state were diseased, or that he was not permitted, although ready, to prove that none of said sheep were diseased, cannot be entertained. The appellant himself testified that he had the sheep in Box Elder county, Utah, which is designated in the proclamation of the governor as one of the infected districts, and against which quarantine had been declared for the period of twenty-five days. The fact that these sheep came directly from an infected district was sufficient to establish their capability and liability to communicate disease. The authorities upon the disease known as "sheep scab" say that it may be communicated by contact of one sheep with another, or indirectly from tags of wool, or from fences, posts, etc., against which scabby sheep have rubbed, or from the places where the sheep have been "bedded down." (See Report of Chief of Bureau of Animal Industry for 1898.) What protection, then, have the sheep-growers of Idaho, without the aid of just such preventive laws as that under consideration?

We have examined and considered the various assignments of error set out in appellant's brief, and we do not think that any of them present reversible error. Appellant claims that the venue is not properly laid. We do not think this contention can obtain. The bringing into any county of the state of sheep from the prescribed districts is an offense, and prosecution therefor may be instituted in any county where the sheep are found. We do not think that the act delegates to the governor legislative power. It simply requires him to act when he ascertains that certain conditions exist. This is not a delegation of legislative power, as we understand it. Having ascertained, through entirely proper and legitimate methods, the existence of the exigency which, under the law, required

him to act, he did so. He could not have done otherwise without being obnoxious to the charge of dereliction in official duty. The claim that the law discriminates against the citizens of Utah is entirely unsupported. We think most, if not all, of the other questions raised in the assignment of errors have been disposed of in this opinion. The judgment of the district court is affirmed, with costs to respondent.

Quarles and Sullivan, JJ., concur.