J. C. McSween, et al., *Appellants*, v. State Live Stock Sanitary Board of Florida, a Corporation, et al., *Appellees*.

En Banc.

Opinion filed May 9, 1929.

W. W. *Flournoy,* for Appellants;

D. *Stuart Gillis,* for Appellees.

LOVE, Circuit Judge:

This case is before this Court on two separate appeals from the Circuit Court for Walton County, one from the order of one of the Judges of said Court denying an application for a temporary restraining order, made on March 24, 1926 and the other from a final decree sustaining a demurrer to the bill and dismissing the same, rendered August 19, 1926. The order denying the temporary injunction was affirmed by this Court, in an opinion filed April 30, 1927; but upon a petition therefor a rehearing was granted. As the entire record is now before this Court, it is expedient to dispose of both appeals at this time.

The bill of complaint was filed in behalf of the several complainants who allege that they are citizens and taxpayers of the State of Florida, and residents of that part of the state within the territory described as being in zone 14 by Chapter 9201 Acts of 1923, the bill in substance attacking the constitutionality of said Chapter 9201, the validity of certain orders and regulations adopted by the State Live Stock Sanitary Board on March 2, 1926 providing for the institution of systematic cattle dipping in zones numbered 14 and 16, quarantining such zones and fixing the amount of compensation to be paid to cattle owners for one-half of the necessary cost and expense of dipping animals in connection with the process of eradicating the cattle fever tick, and the conditions prescribed for the payment thereof, the right of several members of said Board to hold their office and also the legality of the office of the State Veterinarian, appointed by the Board under the provisions of said Act.

The bill is too voluminous to be reproduced here, but the several matters alleged and the charges made upon which complainants based their application for relief will be taken up and determined as far as necessary, and within reasonable limits discussed.

The validity of the Act is assailed because, as it is charged, the title thereof is in violation of Art. 3, Sec. 16 of the Constitution of Florida, which provides that:

Each law enacted in the Legislature shall embrace but one subject and matters properly connected therewith, which subject shall be briefly expressed in the title.

The title of the Act in full is as follows:

An Act to create a State Live Stock Sanitary Board and to make the same a Body Corporate and to prescribe the powers and duties of said Board, and to prescribe the qualifications of the members thereof, their compensation and term of office and providing for the giving of a bond by the Members of said Board for faithful performance of the duties of their office; providing for the employment of a State Veterinarian, prescribing his duties, term of office, compensation and bond to be given; providing for the division of the State of Florida into quarantine areas, and zones, prescribing the method and system of tick eradication work in the State of Florida, providing for notices to be given by said State Live Stock Sanitary Board; prescribing the method and manner of conducting tick eradication work and designating where the same is to be begun, and defining the word ''Cattle'' and providing for the payment of the costs and expenses of carrying on said tick eradication work; providing for the levy of a tax to provide the necessary funds for tick eradication work; prescribing the method of the enforcement of tick eradication work and providing for the sale of cattle thereunder; prescribing the duties and compensation of sheriffs in connection with duties imposed upon sheriffs by this Act. Providing for the

disbursement of the funds arising from the sale of cattle made by authority of this Act, and the payment to the owner of the net proceeds of any and all such sales; providing for the repeal of all laws and portions thereof in conflict with this act and providing when this Act shall become effective.

In support of their contention it is urged by complainants that in addition to the creation of a State Live Stock Sanitary Board and other matters properly connected therewith, other unrelated and incongruous matters and subjects are embraced within the body of the Act, instancing the provisions made for compulsory arbitration of certain designated possible differences that may arise between the owners of cattle and such Board and its officers; for the extension of the duties and powers of the sheriffs of the several counties of the State and for their compensation in connection therewith; also for the extension of the powers and duties of the Comptroller and Treasurer of the State, relative to the issuance and payment of certain warrants for the expenses of such Board and its officers.

The Constitutional provision cited forbids the Legislature to embrace in one act two or more unconnected subjects, but provisions on one subject and matters germane thereto and connected therewith may be embraced in the same Act. Smith v. Chase 109 So. R. 94; Fine v. Moran, 74 So. R. (Fla.) 417; 77 So. R. 533; Schiller v. State, 49 Fla. 25, 38 So. R. 706.

The subject matter of the Act in question relates to tick eradication work in the State of Florida and provisions are made therein for the manner and methods of carrying on such work.

The matters cited as constituting a departure from the title of the Act are but some of the particular details of a general design, bearing a reasonable and logical rela-

757

tion to the subject matter and are included in the Act to effectuate the general object and purpose of this legislation. These matters advanced as offensive to the cited constitutional provision, when considered in connection with the general purpose and object of the Act, do not open the Act to a successful attack on the ground that it provides for a plurality of subjects, or that the body of the Act contains provisions not connected with or germane to its subject as expressed in its title.

As to the provision in the Act for compulsory arbitration, it is strongly insisted on behalf of complainants that the same is invalid for the reason that such a remedy or method of procedure is such a radical change from ordinary judicial processes as, if such provision is not itself void as violative of the constitutional provisions delegating the settlement of differences exclusively to the judicial department, in the absence of the consent of the parties to submit them to arbitration or some other tribunal, it is necessary to the validity of such a provision in the Act under consideration that the title should be not only broad enough to include such a radical change in legal procedure, but that it should be expressly referred to therein.

The allegations of the bill do not show that complainants were or are affected or concerned by such provisions, there being no allegations or charges in the bill that any question or disagreement has arisen between such state agencies and complainants under which the arbitration feature of the statute has or could be invoked, and therefore they can not raise an objection to this part of the statute, unless its alleged invalidity renders the entire Act unconstitutional, or renders inoperative such portion of the Act as does injuriously affect their rights. State v. Phillips, 70 Fla. 340, 70 So. R. 367; Stinson v. State 63 Fla. 42, 58 So. R. 722; State v. City of Sarasota 92 Fla.

563, 109 So. R. 473; Lainhart v. Catts, 73 Fla. 735, 75 So. R. 47.

The provisions of the Act invoking arbitration is applicable when the State Live Stock Sanitary Board or the State Veterinarian and the owner of cattle to be dipped, are unable to agree upon the amount of the costs and necessary expenses of collecting together and driving such cattle to and from the dipping vats, the owner being entitled, under the provisions of the Act, to receive from the State one-half of such costs and expenses. Arbitration under the statute is a remedy afforded the owner for enforcing against the State Live Stock Sanitary Board this right, of which he may or may not avail himself, such Board not being in a position to raise any objection thereto on the ground of its unconstitutionality. State v. State Board of Equalizers 84 Fla. 592, 94 So. R. 681.

As the Legislature might have imposed upon the owner of cattle the entire cost of gathering and driving his cattle to the dipping vat, State v. McCarty 5 Ala. App. 212, 59 So. R. 543, but saw fit to relieve him of a part of such expense, affording him a remedy by which he might avail himself of this liberal concession, it is not made clearly to appear that had the legislature contemplated that the owner would have refused to avail himself of this privilege, the entire act would not have been passed.

In a long line of decisions this court has consistently held that because a part of a statute should be found unconstitutional, it does not necessarily render the whole act void; if the legislative purpose as expresed in the valid portion can be accomplished independent of the unconstitutional portion, and considering the entire act, it can not be said that the legislature would not have passed the valid portion had it known that the invalid portion must fall.

Phillips v. Bell, 84 So. R. 225; 94 So. R. 699 and cases there cited.

We can not say that if this provision of the act is invalid, the legislature would not have passed the valid portion of the act, had it known that this part must fall. The contrary is evidenced by the language of Sec. 19 of the Act where it is explicitly stated:

"This act shall be liberally construed and if any portion thereof be declared invalid, the remaining portion of the act shall not be affected thereby and it is the intention of the Legislature to preserve any and all parts of said act if possible."

It being unnecessary therefore for the proper disposition of this case to pass upon the validity of the stated provision of the act, we leave that question undecided.

Lainhart v. Catts, 75 Fla. 735; 75 So. R. 47.

The further contention made in the bill that the title of the act violates Art. III, Sec. 16 of the Constitution in that the act provides for the extension of the powers of the sheriffs and those of the Comptroller and Treasurer, are not argued in the lengthy brief of complainants and will be treated as abandoned.

Tampa Elec. Co. v. Bazemore, 85 Fla. 164; 96 So. R. 297.

However, complainants attack the validity of Sections 16 and 17 of Chap. 9201, on the ground that thereby the Comptroller is authorized and required to audit and draw his warrant on the State Treasurer for the amount of the monthly requisition of the Board for its incidental expenses for the ensuing month as said Board may deem necessary and sufficient, and upon the receipt of such requisition is required to endorse on the same the amount they may so require and the Treasurer shall thereupon transmit the amount so named in such requisition to the State Live

Stock Sanitary Board, the position taken being that such sections are in violation of Sec. 24, Art. IV of the Constitution of Florida which provides:

"The Treasurer shall receive and keep all funds, bonds, and other securities, in such manner as may be prescribed by law, and shall disburse no funds, nor issue bonds, or other securities, except upon the order of the Comptroller, countersigned by the Governor, in such manner as shall be prescribed by law."

The attack made is upon sections of the statute authorizing the expenditure of public funds, and therefore complainants as taxpayers are of right entitled to have this question determined under the allegations of their bill.

The contention is that said sections require the Treasurer to disburse public funds upon the order of the Comptroller without the same being "countersigned by the Governor in such manner as shall be prescribed by law." The same contention was involved and disposed of by this court adversely to this contention of complainants in State v. Croom, 48 Fla. 176, 37 So. R. 302 and reaffirmed in State v. Knott, 48 Fla. 188, 37 So. R. 307. The opinion and conclusion of the court in State v. Croom, *supra* are conclusive of the question under consideration and we have no reason to depart from that decision.

Complainants further charge in their bill that the State Live Stock Sanitary Board as constituted at the time of the filing of the bill was not a legally constituted and existing Board for the alleged reason that five of the six members claiming to constitute such board did not possess those qualifications prescribed by Sec. 1 of the Act as essential before they could be legally appointed. Sec. 1 of said Act provides: "There is hereby created and established a Board to be known and designated as the State Live Stock Sanitary Board which shall be com-

posed of seven practical live stock men resident citizens of the State of Florida and actively engaged in the live stock industry, who shall be appointed by the Governor, and shall hold office for four years or until their successors shall have been duly appointed and qualified.''

The bill directly attacks severally the qualifications of five members of the Board, charges that each one did not possess such qualifications, that they nor either of them were eligible under such provision of the statute to hold such office and that their appointment and commission were therefore invalid and void, and that such Board not being constituted according to law it is an invalid, illegal and void body.

The necessary result of these charges is that the title of five of the six members of such Board is attacked and if complainant's contention is to be determined in these proceedings, the status of each one of such five members as an incumbent of the public office must be inquired into and decided.

Assuming the constitutionality and validity of Sec. 1 of the Act, the office of a member of the State Live Stock Sanitary Board is created and established and thereby resulting in a legally existing de jure office. If, as it appears from the allegations of the bill, the five members of the Board whose title to membership, were appointed and commissioned as such, and if as it further appears from the bill they assumed to hold such office and to discharge the duties thereof, they are either *de jure* or *de facto* officers. If officers *de jure*, they are legally entitled to the enjoyment of such office—if *de facto* officers, holding an office legally created and existing, then can their title be called into question in these proceedings?

The generally accepted and recognized rule is, that in the absence of statutory provision to the contrary, *quo*

*warranto* proceedings are held to be only proper remedy in cases in which they are available. Thus they are held to be the exclusive method of determining the right to hold and exercise a public office.

32 Cyc. 1415, 22 Standard Ency. Proced. 17 and see State v. City of Sarasota, 92 Fla. 563, 109 So. R. 473; West v. Town of Lake Placid, 120 So. R. 361; and when the remedy by *quo warranto* is available, it is held that there is no concurrent remedy in equity, unless by virtue of statutory provision. 32 Cyc. 1415. 5th Pomeroy's Eq. Jur. (5th Ed.) Sec. 333.

This doctrine is founded upon considerations of policy and necessity, for the protection of the public and individuals who may be affected thereby. ''Offices are created for the benefit of the public and private parties are not permitted to inquire into the title of persons clothed with the evidence of such office and in the apparent possession of their powers and functions. For the good order and peace of society their authority is to be respected and obeyed, until in some regular mode prescribed by law their title is investigated and determined.''

Norton v. Shelby County, 118 U. S. 425, 30 L. Ed. 178-186.

In holding that the right to attack the title of one holding office and discharging the duties thereof can not be exercised in a court of equity, it is presupposed that the office affected was validly created and is legally existing; but if the alleged office was not validly created this doctrine does not apply.

Complainants further in their bill attack the constitutionality of the Act in question because, as they allege, of its provisions creating the position of State Veterinarian, imposing upon him certain duties, vesting him with certain powers and endowing him with certain characteristics,

which taken and considered together in effect make him a public officer; but authorizes his employment by the State Live Stock Sanitary Board, in violation of Sec. 27, Art. III of the Constitution, providing that, "The Legislature shall provide for the election by the people or appointment by the Governor of all State and County officers not otherwise provided for by this Constitution, and fix by law their duties and compensation."

The first question thus presented for determination is whether the State Veterinarian is a State officer, within the meaning of the Constitution, to be appointed only by the Governor or elected by the people or whether he is an employee who may be appointed or employed through some other source of authority.

The pertinent provisions of Chap. 9201 creating the position of State Veterinarian, determining his qualifications, duties, powers and tenure are as follows:

> The Board shall have the power, and it shall be its duty, as soon as practicable after its organization, to employ a person who shall be an experienced expert in infectious, contagious, and communicable diseases of cattle, hogs, and other domestic animals, who shall be a person of recognized ability, and a graduate of a recognized and reputable college of veterinary medicine, who shall be known and designated as the State Veterinarian. Said State Veterinarian shall be the chief executive officer of said Board and Secretary thereof. The State Veterinarian shall be paid a salary of Four Thousand ($4,000.00) Dollars annually, payable monthly, and the Board shall prescribe the powers and duties of said Veterinarian. He shall not be dismissed except for cause, and shall give a bond in the sum of Ten Thousand ($10,000.00) Dollars, payable to the Governor or his successors, conditioned for the

faithful performance of his duty. The term of employ-
ment of the State Veterinarian shall be for the period
of four years. (Sec. 7, Chap. 9201, Acts of 1923.)

When any zone or part of zone shall have been
placed under quarantine, and dipping vats, fences
corrals and pens shall have been constructed, the Board
may and shall by resolution fix the date when such
regular systematic dipping of cattle shall begin. The
resolution shall contain a schedule showing each dip-
ping vat by name or number and shall show the date
on which the first regular systematic dipping of cattle
is to be held at each such vat and the date of each
subsequent dipping at each such vat, and notice of
adoption of such resolution in a newspaper published
in such county once a week for two successive weeks
and by posting a copy two weeks before dipping shall
begin at the Court House door in each county in said
zone, or as near as may be convenient to each and every
dipping vat so to be used. It shall then become the
duty of each and every person, or corporation who is
then or thereafter the owner, custodian or person in
charge of any cattle then or thereafter being within
said zone or part of zone, to be dipped within said zone
or part of zone, fourteen days from and including the
first dipping date in said zone as specified in the
aforesaid resolution, to dip all of such cattle at one
or more dipping vats described in the resolution and
schedule as shall be most convenient upon the date
specified for dipping at such vats respectively, and to
dip or cause to be dipped all such cattle at each and
every fourteen days from and after the date of the
first dipping of such cattle in such vat as shall be most
convenient until such time as the Board shall dis-
continue dipping in such zone or part of zone; pro-

vided, however, when any owner, custodian, or person in charge of any cattle which are infested with the cattle fever tick, by an order, rule or regulations of the State Live Stock Sanitary Board be required to disinfect such cattle by dipping same as hereinbefore, provided, that one-half the actual, necessary and reasonable expense incurred in collecting together and driving such cattle to and from the dipping vat by such owner, custodian or person in charge of same, in compliance with such order, rule or regulation of said State Live Stock Sanitary Board shall be paid by the said Board to such owner, custodian, or person in charge of such cattle, provided such actual, necessary and reasonable expense is incurred with the approval and consent of the State Live Stock Sanitary Board or the State Veterinarian, and provided further that in the event said State Live Stock Sanitary Board or the State Veterinarian and the owner, custodian, or person in charge of such cattle are unable to agree upon the cost of collecting together and driving such cattle to and from dipping vat or vats, the cost shall be determined by three disinterested parties, one to be selected by the said Board or State Veterinarian, one by the owner, custodian, or person in charge of such cattle, and such disinterested persons shall jointly agree upon the third disinterested person, and the findings of such disinterested persons shall be binding upon the Board and the owner, custodian or person in charge of such cattle. In the event the arbitrators refuse or neglect to determine the actual, necessary or reasonable expense herein mentioned, then the State Live Stock Sanitary Board may at its option proceed to collect together and drive to and from the vat or vats the cattle of such owner, custodian or person in

charge of such cattle, and one-half of the expense so incurred by the said Board shall be and become a charge against the owner, custodian, or person in charge of such cattle, and if not paid in thirty days, then a lien upon the cattle so collected together and driven to the vat or vats is hereby created for such amount in favor of said State Live Stock Sanitary Board.

Whenever the State Live Stock Sanitary Board shall adopt the pasture rotation method of tick eradication, as provided for in this Act, and shall require the removal from the zone or part of zone in which systematic tick eradication work is being carried on of cattle of any owner, custodian or person in charge of such cattle, the said Board shall furnish the necessary assistants required to remove such cattle from such zone or part of zone, or in lieu thereof the State Live Stock Sanitary Board may, at its election, pay to such owner, custodian or person in charge of such cattle, the actual necessary or reasonable expense to be incurred by such owner, custodian or person in charge of such cattle in so complying with the requirements of the Board in removing such cattle from such zone or part of zone as hereinbefore provided.

In the event the State Live Stock Sanitary Board and the owner, custodian or person in charge of any cattle shall be unable to agree upon the actual necessary and reasonable expense of collecting together and driving such cattle to and from the dipping vat or vats, and such owner, custodian or person in charge of such cattle shall, during the time of such disagreement, be compelled to comply with the requirements of this Act as to dipping cattle, such owner, custodian or person in charge of such cattle shall be entitled to

recover from the Board one-half of the actual necessary and reasonable expense so incurred by him under this Act. The amount thereof to be fixed by arbitration as hereinbefore provided.

From these provisions, it is to be noted that the statute does not specifically create the "office" of State Veterinarian to be filled in some designated manner but confers upon the State Live Stock Sanitary Board the power and imposes upon it the duty to employ a person who shall be an experienced expert in infectious, contagious and communicable diseases of cattle, hogs and other domestic animals; one who is of recognized ability, a graduate of a recognized and reputable college of veterinary medicine, who shall be known and designated as "The State Veterinarian." Such State Veterinarian, the statute further provides in Sec. 7, shall be: (1) Chief Executive Officer of said Board, (2) the Secretary thereof and (3) his powers and duties shall be prescribed by the Board. (4) His salary is fixed at the sum of $4,000.00 annually, payable monthly, (5) he is required to give a bond in the sum of $10,000.00 for the faithful performance of his duties, (6) his term of employment is for four years, and (7) he shall not be dismissed therefrom without cause. In Sec. 11, he is authorized (8) to approve the expense incident to collecting and driving cattle to the dipping vats, one-half of which is to be paid by the State. In the event of a disagreement as to such expense between the owner of such cattle and the Board or the State Veterinarian, the latter is authorized (9) to choose one of the three arbitrators, to determine such expense, whose findings it is provided shall be binding upon the Board and owner. (10) In event of such disagreement as to the expense mentioned, and the owner is compelled to comply with the requirements of the Act as to dipping his cattle, the owner, it is provided, may

recover from the Board one-half of such expense to be fixed by the three arbitrators, designated as in said act provided, one of whom the Board or State Veterinarian is authorized to appoint. (11) In the title to the act his position is designated as an "office," the following language being used: "Providing for the employment of a State Veterinarian, prescribing his duties, term of *office, compensation and bond to be given.*"

It may be helpful to obtain a clear understanding of the nature of certain of the characteristics of the State Veterinarian, to take into consideration:

1st. That the position and the duties of State Veterinarian being creatures of the Statute remain even though the incumbent dies, and,

2nd. That he is the chief executive officer of the Board. While the Statute does not specifically define all of his duties, yet their scope and extent may be determined from the meaning of the term and the nature of the administrative functions of such Board. This court has defined the term "Executive," as applied to the chief executive officer of the State, the Governor, to mean, "A duty appertaining to the execution of the laws as they exist." Advisory Opinion, 23 Fla. 297; 6 So. R. 925. An executive officer is defined in 23 C. J. 982, as "one in whom resides the power to execute the laws; one whose duties are mainly to cause the laws to be executed and obeyed."

As the members of the State Live Stock Sanitary Board receive no compensation for their services except for the actual and necessary expenses paid or incurred in the discharge of their duties, it is obvious that this body functions, as doubtless it was contemplated they should, more as a deliberative body and in making general rules and regulations, which, under the power conferred on this body by the Statute, have the force and effect of statutes,

if within the scope and intent of the authority conferred by statute,. are reasonable and just with reference to all rights materially affected thereby and are in accord with applicable organic provisions and limitations. State v. Jacksonville Terminal Co. 90 Fla. 721, 106 So. R. 576, Bailey v. Van Pelt, 78 Fla. 337, 353; 82 So. R. 789.

To its chief executive officer is left the duty of enforcing such rules and regulations and of the details of administering these rules and regulations as well as largely of effectuating the purpose and intent of the state itself.

Are these enumerated duties, powers and attributes, those of a public officer or simply an employee? In State v. Sheats, 83 So. R. 508, this court, in discussing the characteristics of an "office" as distinguished from "employment" held that: "Some offices are merely clerical or ministerial; but they are useful in enforcing the powers conferred on other officers and tribunals and they are usually designated as *offices* by the law and have features of tenure, duration and of duties prescribed by law, which differentiate an office from a mere employment."

In State v. Hocker, 39 Fla. 477, 22 So. R. 721; 63 A. S. R. 174, a comprehensive and extended definition of the terms "office" and "officers" is given, which has frequently been cited and approved by this court, and is stated in the first headnote in the following language:

The term "office" implies a delegation of a portion of the sovereign power to, and possession of it by, the person filling the office; a public office being an agency for the state, and the person whose duty it is to perform the agency being a public officer. The term embraces the idea of tenure, duration, and duties, and has respect to a public trust to be exercised in behalf of government, and not to a merely transient, occasional, or incidental employment. A person in the serv-

ice of the government, who derives his position from a duly and legally authorized election or appointment, whose duties are continuous in their nature, and defined by rules prescribed by government, and not by contract, consisting of the exercise of important public powers, trusts or duties, as a part of the regular administration of the government, the place and the duties remaining though the incumbent dies or is changed, is a public officer; every ''office,'' in the constitutional meaning of the term, implying an authority to exercise some portion of the sovereign power, either in making, executing, or administering the laws. A state officer is one who falls within this definition, and whose field for the exercise of his jurisdiction, duties and powers is coextensive with the limits of the state, and extends to every part of it.

Cited and quoted in Dade County v. State, 116 So. R. 72-76.

In the same opinion, State v. Hocker, the Court says:

The act in question, makes the board of legal examiners created by it the sole and exclusive instrument by and through which this highly important and delicate governmental power is to be exercised and thereby confers upon them the exercise of governmental functions. The duties it prescribes for them are lasting and continuous, and not merely casual, temporary or incidental, but the place and duties remain even if the person appointed to perform them shall die or resign. It prescribes a regular tenure of office, with fixed periods when successors are to be appointed; and emoluments are prescribed, parsimonious though they may be in amount. The office and the officers are created by governmental authority for the discharge

of legally prescribed public duties as part of the sovereign power of the state and for the public good. They are not only clothed with power to apply the test of all applicants, and to judge of such fitness but are further empowered by rules of their own adoption, to prescribe the scope and character of such test. They are state officers, because the field for the exercise of their jurisdiction, duties and powers is coextensive with the limits of the State, and extends to every part of it.

See also State ex rel. Swearingen v. Jones, 79 Fla. 56; 84 So. R. 84.

Applying these tests to the statutes under consideration, we find that the designated State Veterinarian is authorized, if at all, governmental authority for the discharge of legally prescribed public duties for the public welfare. Such duties are continuous and lasting in their nature, and not merely casual, temporary or incidental, but the place and duties remain even though the incumbent dies or resigns. These duties are defined by rules prescribed both by the act itself and by the Board under authority of the statute and not by contract and consist of the exercise of important public powers, trusts and activities, as a part of the regular administration of governmental functions. The State Veterinarian, in his capacity as chief executive officer of the State Live Stock Sanitary Board, is charged with the duty of executing or causing to be enforced the valid rules and regulations of such board, which have the force and effect of a law of the Legislature; and like the ordinances of a municipality, they may be said to be in force by authority of the State. Pierce v. Doolittle, 130 Iowa, 6 L. R. A. (N. S.) 143; State v. Rosmussler, 7 Idaho 1, 97 A. S. R. 234; and therefore are a part of the sovereign power of the state.

The powers and duties conferred upon the State Veterinarian by the Statutes cited as well as by the rules and regulations of the Board aforesaid, are most important, varied and delicate in their nature, which can be successfully performed only by one of large experience and knowledge of affairs, and are in a high degree authoritative, discretionary and final in their character. He is the instrument by and through which such Board functions and the object, purpose and intent of the act in question effectuated.

The administrative functions in the execution of the powers and duties conferred by statutes and the rules and regulations of the Board of which he is the Chief Executive officer, require the exercise of State governmental authority, involving discretion and responsibility, and not merely clerical or expert assistance, and are such as the Constitution contemplates shall be performed by officers elected by the people or appointed by the Governor.

If the powers and duties of the State Veterinarian prescribed by the rules and regulations of the State Live Stock Sanitary Board, which may be construed as an attempt to confer upon such Veterinarian sovereign powers be eliminated as unauthorized by a valid statute, yet there remains the powers and duties prescribed by the statute cited, the exercise of which the Constitution contemplates shall be by and only by a duly elected or appointed officer. These powers and duties enter into the very reason for the existence of such position, if the obvious intent of the Legislature is to be regarded with respect to the position of the State Veterinarian, his powers, duties, emoluments, tenure and his liabilities, and therefore it is impracticable to eliminate from the statutes all of the provisions that serve to render the position an office instead of an employment, leaving merely a shell without the meat, a shadow

without the substance. Holding as we do that the State Veterinarian can be created only by the appointment of the Governor or elected by the people, it follows that such position as is attempted to be created by the Act is unconstitutional and that part of the Act providing for the appointment of such officer is void and unconstitutional. While it is clearly within the province of the Legislature to create an office of the nature herein considered, yet the Constitution of the State expressly and mandatorily requires that provisions shall be made to fill such offices either by an election by the people or appointment by the Governor. Art III, Sec. 27. As the Legislature has not yet made such provisions there exists no authority to appoint such an officer.

It is further contended that Sec. 8 of Chap. 9201, violates organic law in that by the declaration therein stated, viz: "It is hereby found and declared that the territory and cattle in the State of Florida are infested with the cattle fever tick," and in enacting the further provisions of said section based upon such determination the legislature assumed power to determine and did finally determine questions of law and fact which are properly within the province only of the judiciary department to determine. Further, it is alleged that the said declaration of the Legislature was made "not only without any knowledge of the facts so found and so declared, but also without giving any hearing to the complainants as the owners of cattle and as citizens and tax payers" . . . without which it is claimed complainants were denied due process of law under both State and Federal Constitutions. Thus complainants seek to invoke a judicial review of the Legislative determination as to facts and assail such determination as being made by the Legislature "without any knowledge of facts so found and declared." Without any prolonged discus-

sion of this contention, but after a full and careful consideration of the argument and authorities set forth in the extremely full and comprehensive brief of complainants, we can not agree therewith. The determination of facts upon which the validity or constitutionality of statutes may depend is primarily for the legislature, the general rule being that the courts will acquiesce in the legislative decision unless it is clearly erroneous, arbitrary or wholly unwarranted.

Lainhart v. Catts, 73 Fla. 735, 75 So. R. 47.

In the instant case the matter alleged to have been determined by the legislature without knowledge of the facts, is a matter of common knowledge, as it is generally and well recognized that cattle generally in the State, especially those running at large, were at the time of the enactment of such legislation infested with the cattle fever tick; that such infestation was and is the cause of Texas fever, a communicable and dangerous cattle disease. State v. McCarty, 5 Ala. App. 212, 59 So. R. 543. While there may exist some dissension from this theory generally accepted as an established and scientific fact, yet the courts have no power to determine the merits of conflicting theories, upon which the legislature has assumed to pass, and by judicial determination, in each separate case arising, sustain or defeat legislation according to whether the courts happen to approve or disapprove of the Legislative determination or whether the facts adduced in one case support such legislative determination and in another tend to refute it. 6 R. C. L. 114.

It is contended, however, that the allegations of the bill in this respect are admitted by the demurrer to be taken as true for the purpose of determining the validity of this Act. This position is not tenable as the law is to be tested as to its validity in this respect by its language in the light

of such matters as will be taken judicial notice of by the Court. This statement is not to be taken as holding that the courts are not open to review any exercise of legislative determination, as there may be cases of such flagrant abuse of legislative power as would warrant the intervention of a court of equity to protect the Constitutional rights of individuals and citizens because of arbitrary and wholly unwarranted legislation. Lainhart v. Catts *supra*. In the light of matters of which the Court takes judicial notice, the allegations of the bill are not sufficient nor are they of such a character as would warrant an investigation by the Court of the knowledge or lack of knowledge by the legislature of the facts stated to be determined in the Act, at the time of its passage.

Due process of law was not denied complainants in that they were not given an opportunity to be heard by the legislature in the determination of the facts declared. Though it may be that complainants' particular cattle may not have been infested with the cattle tick, it does not follow from the allegations of the bill that they might not at any time be exposed to such infestation and thereby communicate the disease to other cattle. Clearly this is a matter for the legislature to determine in the exercise of its police powers in the protection and promotion of an important industry by controlling, minimizing and if possible stamping out a dangerous and communicable infection to which cattle are subject.

'It is unnecessary to pass upon the further contentions made in the bill to the effect that tick eradication work in Zone 14, the quarantine of said zone and the rules and regulations adopted by the Board for carrying on said work is contrary to law and are unauthorized, void and invalid for the reason that systematic tick eradication work and dipping cattle to that end in Zones 14 and 16, including

the territory specifically involved in this case was completed on Nov. 12, 1927 and such zones officially declared free from cattle fever tick and released from quarantine effective Dec. 1, 1927, as appears from certified copies of orders of the State Live Stock Sanitary Board and Rule 1, Revision 26, U. S. Department of Agriculture filed at the oral argument of this case. Occurrence of such events may be shown to appellate courts by extrinsic evidence. 3 C. J. 115. Thereby these are rendered moot questions as the relief prayed for can not now be granted, or the events with reference to which such relief is sought having taken place, the relief prayed for can not be made effective.

The alleged jurisdictional defect presented to this court by an amendment made here to the motion for an injunction attacking the passage of the act, because it appears from the Senate Journal for the year 1923, that the majority of the Senators present did not vote for the passage of the bill cannot be sustained. Counsel for complainants has not argued this question in his brief and an inspection and reading of the Senate Journal does not disclose anything to show that the act in question was not passed in conformity to Constitutional requirements.

For the error stated the orders appealed from are reversed and the cause is remanded for appropriate proceedings.

WHITFIELD, ELLIS AND STRUM, J. J., concur.

TERRELL, C. J., AND BROWN, J., dissent.

BUFORD, J., disqualified.