251 So.2d 284 (1971)
GENERAL DEVELOPMENT CORPORATION, a Delaware Corporation, Appellant,
v.
Claude KIRK, Jr., et al., Appellees.
No. 70-184.
District Court of Appeal of Florida, Second District.
July 14, 1971.
Rehearing Denied September 3, 1971.
Charles J. Cheves, Jr., of Wotitzky, Wotitzky & Cheves, Punta Gorda, and Hazen & Isphording, Venice, for appellant.
Wilson & Wilson, Sarasota, for appellees.
MANN, Judge.
It all began before the War, in 1850. A U.S. Government surveyor plotting the west shore of Charlotte Harbor at the mouth of the Myakka River confused several sections with the ones immediately north. Thus, his section 11 looks like the shore line in what is actually section 2. He did not show any of section 2 on the river, but it is there.
In 1899, William Wood, perhaps relying on the incorrectly numbered survey, deeded a parcel commencing at a point which bears South 4° 15' East from the center of the foot of a cattle dock, in section 11, containing "twenty acres, no more nor no less."
From 1913 to 1933, tax certificates were issued for this property, and eventually the State acquired title under the Murphy *285 Act. In 1945, Fern and Beulah Conway applied for a deed, and the Trustees of the Internal Improvement Fund issued it: twenty acres, in section 11:

 Amount
 No. Date Description Sec. Tp. Rg. Ac. Rec'd
 24 1913 Beg at a point which bears 40 deg E. 257 ft from
 center of foot of cattle dock & run W from said point
 869 to W bdry of lot 2 then N 300 ft then E to a point on
 1933 Myakka River at highwater mark then SE'orly meandering
 River to beg.
 11 41 21 20 $23.70.

In 1956, General Development's predecessor in title, Florida West Coast Land Company, as uplands riparian owner, applied to the Trustees to purchase approximately 337 acres of sovereignty land lying east of the government survey meander line, including Cattle Dock Point. The Conways protested. They had discovered that Cattle Dock Point was within section 2, and asked for a deed to the land which had been misdescribed as lying in section 11.
The Conways were in possession of a tract around the old cattle dock site, and the staff of the Trustees proposed a corrective deed to the Conways, the Conways discontinued protesting the sale to Florida West Coast Land Company on condition that they first got their title straightened out, and everybody seemed happy when the Conways got their twenty acres and Florida West Coast Land Company got the remaining 317 acres. Several descriptions were proposed, and apparently no actual survey was made to get an accurate one. The Conways got a corrective deed to:

 Amount
 No. Date Description Sec. Tp. Rg. Ac. Rec'd
 24 1913 Begin at a point which bears South 4° 15' E. 257.
 ft. from center of foot of Cattle dock in Sec. 2,
 869 1933 T.41S R. 21 E., and run west from said point to
 the West Boundary of Sec. 2; Then North to
 the north boundary of SW of said section 2;
 Then East to point on Myakka River at high
 water mark of said river; Then Southeasterly
 meandering river to point E. of Begin;
 Then W. to Begin. 20
 2 41 21 more $23.70
 or
 less.

The description used in the deed was later shown to cover not twenty but 57.8 acres.
General Development sought to reform the deed given by the Trustees to the Conways. The trial judge thought that the corporation lacked standing to reform the Conway deed and granted summary judgment. We disagree.
Not much that is written about standing is worth reading. There are cases which *286 lead one to believe that the later grantee lacks standing to attack a deed to an earlier grantee from a common grantor. A preoccupation with privity of estate led the Supreme Court of Georgia to hold that "the grantee in the second deed cannot maintain a suit in equity to reform the first deed, although the description may be incorrect and be due to the mutual mistake of the parties." Garlington v. Blount, 1917, 146 Ga. 527, 91 S.E. 553; Hilton v. Hilton, 1947, 202 Ga. 53, 41 S.E.2d 880. In Rawson v. Brosnan, 1939, 187 Ga. 624, 1 S.E.2d 423, the same court deals with the problem as if it is not one of "standing," but of right, and adheres to Garlington. The second grantee's quarrel is said to be with his grantor. That points up the difficulty here: the uplands riparian owner has a prior right to purchase, but the Trustees of the Internal Improvement Fund don't have to sell.[1] We think the Georgia cases are unsound. In Taylor v. Peterson, Colo. 1956, 133 Colo. 218, 293 P.2d 297, the Supreme Court of Colorado adopts an ambiguous, but similar position, discussing both standing  as if it doesn't exist  and the substantive right, as if after plenary hearing it were not proved, without apparent recognition of the inconsistency.
We think a more reasonable view of standing is found in Jones v. McNealy, 1904, 139 Ala. 378, 35 So. 1022; Williams v. Hebbard, 1939, 33 Cal. App.2d 686, 92 P.2d 657; Kowatch v. Darnell, 1958, 354 Mich. 197, 92 N.W.2d 342; Polhamus v. Hines, Sup.Ct. 1926, 128 Misc. 299, 218 N.Y.S. 401 (parties "sufficiently in privity"); and Houlihan v. Murphy, 1962, 93 R.I. 499, 177 A.2d 192 (no discussion of standing, but action allowed.) See also Annotation, 79 A.L.R.2d 1180.
It is not "privity" but a legitimate interest warranting invocation of the judicial power of the state which ought to determine standing to sue. Our courts have permitted taxpayers to challenge legislation where the plaintiff-taxpayer has a direct interest, as for example in the expenditure of public funds,[2] or upon a showing of injury or prejudice to personal or property rights.[3] The courts have denied standing where the party's interest has not vested[4] or is too slight[5] or is clearly not affected by the legislation.[6]
Standing is, in the final analysis, that sufficient interest in the outcome of litigation which will warrant the court's entertaining it. It is beyond doubt that standing is, in most states, no longer determined by first determining some abstract question such as "privity." In this case it is clear that General Development reasonably contends that the extent of the property conveyed to the Conways determined the extent of that conveyed to Florida West Coast Land Company, its predecessor in title. We think the courts of Florida should be open to the presentation of such a contention as this.[7]
*287 Appellees next contend that any error in the corrective deed has been cured by Fla. Stat. 253.12(8) (F.S.A., 1969). This is a curative statute of a type generally described by Professor Day in his article, Curative Acts and Limitations Act Designed to Remedy Defects in Florida Land Titles, 8 U.Fla.L.Rev. 365 (1955). We have examined the cases decided under curative statutes and find that none suggests that mutual mistake going to a significant misdescription of the land conveyed is cured by the act. Indeed, their general purpose is to eliminate disputes about the formalities of conveyancing, and we find no evidence that our Supreme Court has ever thought of them as ousting a court of equity of its jurisdiction to reform deeds.
The appellees' argument that the summary judgment is supported by a finding of laches and estoppel as a matter of law reads too much, in our judgment, into an ambiguous letter from the attorney for Florida West Coast Land Company, who is available to testify. The appellees would read this letter as proving that the full extent of the land conveyed was known at the time. The letter is susceptible also, however, to the interpretation that the land was thought to lie somewhere else entirely. Whether either laches or estoppel defeats reformation in this case depends on issues of fact which should not be disposed of on summary judgment on the present record.
Reversed and remanded for further proceedings, consistent with this opinion.
LILES, A.C.J., and HOBSON, J., concur.
NOTES
[1] Fla. Stat. 253.12(4) (1969) F.S.A. For prior law see C.G.L.Fla. §§ 1387, 1388, 1393, 1426, 1427 (1927).
[2] Rosenhouse v. 1950 Spring Term Grand Jury, Fla. 1952, 56 So.2d 445; McSween v. State Live Stock Sanitary Board of Florida, 1929, 97 Fla. 750, 122 So. 239.
[3] McBridge v. Overstreet, Fla. 1956, 89 So.2d 672; Lykes Bros. v. Board of Commissioners of Everglades Drainage District, Fla. 1949, 41 So.2d 898.
[4] State ex rel. Pringle v. Dykes, 1937, 127 Fla. 665, 173 So. 904.
[5] Bryan v. City of Miami, Fla. 1951, 56 So.2d 924 (disputed election to be held simultaneously with city primary election at slight additional cost already incurred when injunction sought).
[6] Shad v. DeWitt, 1946, 158 Fla. 27, 27 So.2d 517; Hays v. City of Tampa, 1934, 114 Fla. 622, 154 So. 687.
[7] For a general view of the question of standing, see Davis, The Liberalized Law of Standing, 1970, 37 U.Chi.L.Rev. 450; Standing for Review of Actions by Federal Administrative Agencies: A New Test, 1970, 23 U.Fla.L.Rev. 206; Association of Data Processing Service Organizations, Inc. v. Camp, 1970, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184; Barlow v. Collins, 1970, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192; Hardin v. Kentucky Utilities Co., 1968, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787; Flast v. Cohen, 1968, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947.